UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| MARC J. GRENIER,<br>AS ADMINISTRATOR OF THE<br>ESTATE OF LAURA D. SHEEHAN,<br><br>Plaintiff,<br><br>v.<br><br>THE STAMFORD HOSPITAL<br>STAMFORD HEALTH SYSTEM,<br>INC., AND EMERGENCY MEDICINE<br>PHYSICIANS OF FAIRFIELD,<br><br>Defendants. | CIVIL ACTION NO.<br>3:14-cv-0970 (VLB)<br><br><br>September 29, 2015 |

## MEMORANDUM OF DECISION DENYING DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT [Dkt. #24]

Plaintiff Marc Grenier ("Grenier"), in his capacity as administrator of the estate of Laura D. Sheehan ("Sheehan"), brings claims against Defendants Stamford Hospital and Stamford Health System, Inc. (collectively the "Stamford Defendants") under the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd., *et seq.*, and a medical malpractice claim against the Stamford Defendants and Defendant Emergency Medicine Physicians of Fairfield ("EMP") under Connecticut law, for injuries and the ultimate death of Sheehan while in the care of Defendants.

Plaintiff filed his initial Complaint on July 3, 2014. *See* [Dkt. #1]. On October 7, 2014, Plaintiff filed an Amended Complaint, which, among other things, added a malpractice claim against Defendant EMP. *See* [Dkt. #10]. On December 1, 2014, the Stamford Defendants moved to dismiss Count One of the

1

Amended Complaint.  *See* [Dkt. #24].  For the reasons that follow, Defendant's Motion to Dismiss is DENIED.

I.      Background[1]

In the early morning hours of July 7, 2012, Sheehan was transported by Defendant EMP to the Emergency Department of Defendant Stamford Hospital. [Dkt. #10, Am. Compl. at ¶ 22].  At 1:30 am, Sheehan was admitted.  [*Id.*].  Upon arrival, Sheehan was evaluated by members of the Stamford Defendants, who determined that she was in "no acute distress and arousable to touch and name." [*Id.*].  Sheehan also appeared to be "heavily intoxicated."  [Dkt. #10, Ex. B to Am. Compl. at 16].  Sheehan had a documented history of alcohol intoxication, and one nurse noted that Sheehan was "[s]een [at the hospital] multiple times in the

---

[1] For the purposes of Defendants' motion, the Court gleans the facts of this case from the Amended Complaint and all documents attached thereto.  *See* [Dkt. # 10, Am. Compl. and Exs. A and B]; *see also Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) ("[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference."). However, the Court does not consider the July 2, 2013 report by the State of Connecticut Department of Public Health ("Health Report"), which Plaintiff attached as an exhibit to an affidavit submitted in support of his Opposition to the motion to dismiss.  *See* [Dkt. #27-1, Ex. 1 to Burke Aff.].  This Report was neither attached to nor referenced in the Amended Complaint, nor was it integral to the Complaint.  *See B.V. Optische Industrie De Oude Delft v. Hologic, Inc.*, 909 F. Supp. 162, 167 (S.D.N.Y. 1995) (to "reference" a document such that it may be considered at the pleading stage, complaint must contain "clear," "definite," and substantial references to the "extraneous submissions"); *Chambers*, 282 F.3d at 153 (mere notice or possession of report not enough to render it integral to complaint).  That the Report was briefly mentioned as a point of reliance in a document attached as an exhibit to the Complaint does not alter this conclusion.  *See Thomas v. Westchester Co. Health Care Corp.*, 232 F.Supp. 2d 273, 276 (S.D.N.Y. 2002) (finding one brief reference to a document in a single paragraph of complaint insufficient to permit court to consider document on motion to dismiss); *Madu, Edozie & Madu, P.C. v. SocketWorkds Ltd. Nigeria*, 265 F.R.D. 106, 124 (S.D.N.Y. 2010) (extrinsic documents including affidavit and email correspondence not integral because complaint failed to quote or mention email).

past for same issue." [*Id.*; Dkt. #10, Am. Compl. at ¶ 22]. Other than these visual observations and noting Sheehan's prior history of heavy intoxication, upon admission, the Defendants did not perform any internal examination of Sheehan, such as a blood alcohol test.

Throughout the early morning hours, Sheehan was monitored by staff of Defendant Stamford. A test of her glucose level was performed, and two reports were generated, one of which concluded that Sheehan was "in no acute distress, arousable to touch/name." [Dkt. #10, Ex. B to Am. Compl. at 16].

By approximately 7:00 am, the Stamford Defendants determined that Sheehan had '"sobered appropriately . . . 'move[d] all four extremities purposely and symmetrically, that she possessed '5/5 motor strength' and walked with a 'normal gait'." [Dkt. #10, Am. Compl. at ¶ 23]. At 7:18 AM, Sheehan was awake, responsive, requested food, and then fell back asleep. [*Id.*]. Eight minutes later, Sheehan was given discharge instructions and discharged. [Dkt. #10, Ex. B to Am. Compl. at 17]. At the time of her discharge, the Stamford Defendants reported that Sheehan was "alert and oriented as to person, place, time, and walked with a steady gait." [Dkt. #10, Am. Compl. at ¶ 23]. However, despite their knowledge of Sheehan's history of alcoholism and her admission for extreme alcohol intoxication, the Stamford Defendants did not conduct a blood alcohol test prior to her discharge.

Just minutes later, at 7:43 AM, Sheehan was readmitted to the emergency department, upon the Stamford Defendants' staff's observations that Sheehan was "stumbling and walking with an unsteady gait." [*Id.* at ¶ 25]. The Stamford

3

Defendants then conducted a blood alcohol level test "and other laboratory work." [*Id.* at Ex. B at 17]. Hours later, the test results revealed that Sheehan had an "elevated" blood alcohol level of "261." [*Id.*]. No subsequent blood tests were performed.

As the morning of July 7 progressed, Sheehan's condition appeared to worsen. Defendants' staff noted that she appeared "disoriented," that she "needed assistance eating breakfast," and was speaking incomprehensibly. [*Id.* at ¶¶ 26-27]. To relieve her agitation, the Defendants administered a sedative drug, Ativan. [*Id.* at ¶ 28]. The Defendants did not, however, perform a subsequent blood alcohol test or otherwise assess Sheehan's level of intoxication on July 7. Nor did they perform any cognitive tests or other evaluative procedures.

Throughout the remainder of July 7, Defendants' emergency staff continued to observe Sheehan's condition. During this time, they noted that she continued to have difficulty speaking and walking, although she was reported as awake, alert and responsive to questions. [*Id.* at ¶¶ 29-32]. No diagnostic tests were performed and no treatment was administered.

Defendants' staff continued to observe Sheehan throughout the early morning hours of July 8, 2012. Around 3:15 am, Defendants' staff observed that Sheehan "remained unable to ambulate." [*Id.* ¶ 35]. Shortly thereafter, and in response to Sheehan's "loud moaning," at 4:30 am, Defendants' staff sent for additional labs and ordered a CT scan of Sheehan's head. [*Id.* at ¶ 36; Dkt. #10, Ex. B to Am. Compl. at 18]. The medical evaluation revealed Sheehan was

suffering from a stroke, and that her blood alcohol level was zero. [*Id.*]. Prior to this evaluation, the Defendants had not diagnosed Sheehan as having had a stroke. [*Id.* at ¶ 37]. Sheehan remained in the care of Defendants, but by the time her stroke was diagnosed, Sheehan could not be revived. [*Id.* at ¶ 38]. Three days later, on July 11, 2012 at 12:32 pm, Sheehan died. [*Id.* at ¶ 39]. On July 15, 2012, an autopsy was performed. [*Id.* at ¶ 40]. Sheehan's cause of death was identified as a cerebrovascular attack of the left cerebral area, due to thrombosis of her left internal carotid artery and left middle cerebral artery, and left cerebellar infarct, due to distal segment thrombosis of the left vertebral artery. [*Id.*].

The Complaint further alleges that, while in the Stamford Defendants' care, the Stamford Defendants had a duty to ensure that their medical professionals "rendered patient care in compliance with applicable standards of care, guidelines, policies, protocols, rules and regulations on a twenty-four hour basis." [*Id.* at ¶ 16]. In particular, it was the Defendants' duty to establish, implement and enforce rules, guidelines, and standards of care regarding the treatment of patients, and to take steps to ensure that all physicians evaluating and treating patients complied with these rules and standards of care. [*Id.* at ¶¶ 17-18]. Plaintiff also alleges, through the opinion of a reviewing physician, that "there was a departure from the standard of practice by Stamford Hospital staff with respect to Ms. Sheehan's treatment while she was in the Emergency Department." [Dkt. #10, Ex. B. to Am. Compl. at 16]. Specifically, Plaintiff contends that hospital staff "failed to recognize a change in status of a hospitalized patient with a previously normal gait and comprehensible speech to

5

one with an inability to walk and garbled speech caused by a devastating cerebrovascular accident." [*Id.*].

## II. Standard of Review

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Sarmiento v. U.S.*, 678 F.3d 147 (2d Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). While Rule 8 does not require detailed factual allegations, "[a] pleading that offers 'labels and conclusions' or 'formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (citations and internal quotations omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 557 (2007)). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* (internal citations omitted).

In considering a motion to dismiss for failure to state a claim, the Court should follow a "two-pronged approach" to evaluate the sufficiency of the complaint. *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010). "A court 'can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). "At the second step, a court should determine whether the 'well-

pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (internal quotations omitted).

In general, the Court's review on a motion to dismiss pursuant to Rule 12(b)(6) "is limited to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). In addition, at this stage, all factual allegations in the complaint are accepted as true and all reasonable inferences are drawn in the plaintiff's favor. *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008).

### III. Discussion

Count one of Plaintiff's Amended Complaint alleges that the Defendants violated the Emergency Medical Treatment and Active Labor Act ("EMTALA") when they "fail[ed] to properly screen or stabilize the plaintiff's decedent or otherwise fail[ed] to treat her emergency condition." [Dkt. #10, Am. Compl. at ¶ 5]. For the reasons that follow, the Court finds that the Complaint states claims under both prongs of the statute.

#### A. EMTALA

The EMTALA was enacted in 1986 in response to a growing concern of "'patient dumping,' the practice of refusing to provide emergency medical treatment to patients unable to pay, or transferring them before their emergency

conditions are stabilized." *Hardy v. New York City Health & Hosps. Corp.*, 164 F.3d 789, 792 (2d Cir. 1999). To prohibit such discrimination, hospital emergency rooms are subject to two obligations under the EMTALA: (i) to perform an appropriate medical screening and (ii) to stabilize the patient. The screening and stabilization requirements are two separate and distinct obligations. *Brown v. St. Mary's Hosp.*, No. 3:14-cv-228 (DJS), 2015 WL 144673, at *2 (D. Conn. Jan. 12, 2015). Thus, to state a claim under the EMTALA, a plaintiff must allege that he "(1) went to the Defendant's emergency room (2) suffering from an emergency medical condition, and that the Hospital either (3) failed to adequately screen him to determine whether he had such a condition or (4) discharged or transferred him before the emergency condition was stabilized." *Eads v. Milford Hosp.*, No. 3:10-cv-1153 (VLB), 2011 WL 873313, at *2 (D. Conn. Feb. 23, 2011) (citing *Hardy*, 164 F.3d at 792).

On the other hand, the EMTALA is not intended to ensure that each emergency room patient receives a correct diagnosis or otherwise avoids medical negligence. Indeed, it "is not a substitute for state law on medical practice." *Hardy*, 164 F.3d at 792.

### B. Plaintiff's Complaint States a Claim Under the EMTALA for Failure to Screen

To satisfy its screening duty, when an individual "comes to the emergency department and a request is made on the individual's behalf for examination or treatment of a medical condition, the hospital must provide an appropriate medical screening examination within the capability of the hospital's emergency department . . . to determine whether or not an emergency medical condition . . .

8

exists." 42. U.S.C. § 1395dd(a).  An emergency medical condition is defined as "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in . . . placing the health of the individual . . . in serious jeopardy, . . . serious impairment to bodily functions, or . . . serious dysfunction of any bodily organ or part."  42 U.S.C. §§ 1395dd(e)(1)(A)(i)-(iii).

The EMTALA does not define the term, "appropriate medical screening."  However, courts consistently construe this phrase as requiring hospitals to perform "uniform or even-handed screening examinations" that are "consistent with *their own polices*." *Brown,* 2015 WL 144673, at *2 (quoting *Macmaux v. Day Kimball Hosp.*, No. 3:09-cv-164 (JCH), 2011 WL 4352007, at *3 (D. Conn. Sept. 16, 2011) (citing cases)) (emphasis added).  In other words, the screening examination must be "equal, as opposed to treatment that meets professional standards of competence."  *Fisher v. New York Health & Hosps. Corp.*, 989 F. Supp. 444, 449 (E.D.N.Y. 1998).  Accordingly, "a hospital fulfills the appropriate screening requirement when it conforms to its standard screening procedures.  By the same token, any departure from standard screening procedures constitutes inappropriate screening in violation of the EMTALA."  *Id.* (quoting *Gatewood v. Washington Healthcare Corp.*, 933 F.2d 1037, 1041 (D.C. Cir. 1991)).

Here, the Stamford Defendants do not contend that the Complaint fails to plead the first two elements of an EMTALA claim, namely, that the Plaintiff went to the Defendant's emergency room suffering from an emergency condition as defined by the EMTALA.  Nor would such a contention be well-founded.  *See* [Dkt.

9

#10, Am. Compl. at ¶ 22]. However, the Stamford Defendants assert that the Complaint fails to plead a claim of inadequate screening because the Complaint "contains no allegation of disparate treatment." [Dkt. #25, Def.'s Memo. at 8]. Construing the Complaint and the attached Physician's Opinion in a light most favorable to Plaintiff, but mindful of the Rule 8 pleading requirements, the Court disagrees.

Taken together, these documents state a claim for failure to screen in at least three ways. First, the initial failure to perform any blood work or internal examination upon Sheehan's admission to the Emergency Department would support such a claim. *See* [Dkt. #10, Am. Compl. at ¶ 22]. Second, the fact that Sheehan was discharged without any blood work or physical examination beyond observing her movements would also appear to support a failure to screen claim. [*Id*. at ¶ 23]. Third, upon her readmission, the Stamford Defendants performed only one blood alcohol test, which revealed an extremely high level of intoxication, and performed no other internal tests for nearly a twenty-four hour period, during which time, Sheehan's condition was deteriorating and her blood alcohol level was necessarily dropping. [Dkt. #10, Ex. B to Am. Compl. at 17; Dkt. #10, Am. Compl. at ¶¶ 26-32, 36-37].[2]

---

[2] The Court recognizes that these facts appear only in Count Two of the Amended Complaint, which concerns Plaintiff's state law medical malpractice claim. *See* [Dkt. #10, Am. Compl. at ¶¶ 10-43]. While "[t]raditionally, in each count of a complaint, a plaintiff states the facts constituting his legal right to relief of a given kind, and separates out different kinds of legal rights into different counts . . . [w]e are past the days of code pleading and the concomitant construction of complaints against the plaintiff." *Bakhit v. Safety Markings, Inc.*, 33 F. Supp. 3d 99, 106 (D. Conn. 2014). Accordingly the Court construes the Complaint "so as

10

The Stamford Defendants' sole argument in response is that Plaintiff's EMTALA count "contains no allegation of disparate treatment. Rather, read in the light most favorable to the plaintiff, they allege that the hospital defendants failed to properly screen, stabilize and/or treat decedent." [Dkt. #25 at 8]. The Stamford Defendants are mistaken.

First, the Complaint fairly alleges that "the various testing and screening done by the Hospital . . . deviated from the type of examination normally performed . . . on patients with similar symptoms and/or history." [*Id.*] For instance, the allegations concerning the initial screening examination clearly suggest that it was influenced by the fact that Sheehan "had been 'seen here multiple times in the past for [the] same issue.'" [Dkt. #10, Am. Compl. at ¶ 22]. Thus, Sheehan did not receive a standard examination, but one performed in light of her prior treatment, and which did not include any diagnostic examination. The facts pled regarding Sheehan's hasty discharge, the incredibly short period of time between it and her readmission, and the administration of a blood alcohol test upon her return to the Emergency Department, further intimate that the examination she received leading up to her discharge did not conform to the Hospital's standard practices and policies. Moreover, the details concerning Sheehan's declining condition coupled with the passage of nearly a day in between medical testing plainly raise the inference of disparate treatment.

Second, the Complaint pleads facts concerning the duty of the Stamford Defendants to adhere to "guidelines, policies, protocols, rules and regulations"

---

to do justice" and considers the factual allegations pled under Plaintiff's medical malpractice claim under the EMTALA. *Id.*

and elsewhere alleges that "there was a departure from the standard of practice by Stamford Hospital staff with respect to Ms. Sheehan's treatment." [*Id.* at ¶ 16; Dkt. #10, Ex. B to Am. Compl. at 16]. Combined with the specific allegations concerning the examinations Sheehan received, the Complaint states a failure to screen claim.

Third, none of the cases raised by the Stamford Defendants undercuts this conclusion. All but one was decided at the summary judgment stage, and they therefore do not concern the pleading standards of an EMTALA claim. *See Brenord v. Catholic Med. Ctr. of Brooklyn & Queens, Inc.*, 133 F. Supp. 2d 179 (E.D.N.Y. 2001); *Fisher v. New York Health & Hosps. Corp.*, 989 F. Supp. 444 (E.D.N.Y. 1998); *Macamaux v. Day Kimball Hosp.*, No. 3:09-cv-164, 2011 WL 4352007 (D. Conn. Sept. 16, 2011); *Gatewood v. Washington Healthcare Corp.*, 933 F.2d 1037 (D.C. Cir. 1991). The lone case decided on a motion to dismiss, *Vazquez v. New York City Health & Hosps. Corp.*, No. 98 Civ. 7922 (DAB), 2000 U.S. Dist. LEXIS 5614 (S.D.N.Y. Feb. 4, 2000) is readily distinguishable from the present matter, as the complaint failed to allege that the patient was "treated in the [defendant hospital's] emergency room" and offered "no facts to suggest disparate treatment." *Id.* at *10.

Fourth, during the entire time she was hospitalized, Sheehan received only palliative care for her persistent symptoms, in the form of Ativan. *See* [Dkt. #10, Am. Compl. at ¶ 28].

For these reasons, Plaintiff is entitled to proceed with discovery to determine whether and to what extent the screening Sheehan received was consistent with the Stamford Defendants' standard screening procedures.

### C. The Complaint States a Failure to Stabilize Claim

If a hospital determines that an individual has an emergency medical condition, the hospital's second duty under the EMTALA, the duty to provide stabilizing treatment prior to discharge or transfer, is triggered. *See* 42 U.S.C. § 1395dd(b)(1). The EMTALA defines "to stabilize" as "to provide such medical treatment of the [emergency medical] condition as may be necessary to assure, within reasonable medical probability that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility . . . ." 42 U.S.C. § 1395dd(e)(3)(A). The duty to stabilize is a "distinct obligation[]" from a hospital's screening duty, and "it has been determined by some courts that 'the stabilization requirement is not met by simply dispensing uniform stabilizing treatment, but rather, by providing the treatment necessary 'to assure within reasonable medical probability, that no material deterioration of the condition is likely to result . . . .'" *Brown*, 2015 WL 144673, at *2 (quoting *Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1259 n. 3 (9th Cir.1995)).

However, a hospital's stabilization duty applies "only where the hospital 'determines' that the individual has an emergency medical condition." *Macamaux*, 2011 WL 4352007, at *6 (quoting 42 U.S.C. § 1395dd(b)). Thus, the hospital must have "actual knowledge," or diagnosis, of the emergency medical

condition." *Id.* (citations omitted); *see also Brenord*, 133 F. Supp. 2d at 191 ("[A] hospital's duty to stabilize is not triggered unless the hospital has actual knowledge of the individual's unstabilized emergency medical condition.") (quotation and citations omitted). On the other hand, a hospital's deliberate blindness to the existence of an emergency medical condition, such as by failing to perform its standard diagnostic tests to detect such a condition, that is, a failure to screen, could not absolve a hospital of liability for failure to stabilize a patient. *See Morgan v. N. Mississippi Med. Ctr., Inc.*, 458 F. Supp. 2d 1341, 1352, n. 18 (S.D. Ala. 2006) (noting that EMTALA "analysis might be different if [plaintiff] had mustered evidence that [defendant doctor] . . . turned a blind eye" to plaintiff's condition).

The allegations in the Complaint sufficiently plead (and the Stamford Defendants do not contest) that Sheehan suffered from an "emergency condition" as defined by the EMTALA when she was admitted to the Emergency Department. The Complaint further alleges that *within minutes of her discharge*, Sheehan was readmitted and observed "stumbling and walking with an unsteady gait." [Dkt. # 10, Am. Compl. at ¶ 25]. Whereas at the time of her discharge, medical entries prepared by the Stamford Defendants stated that Sheehan was "alert and oriented . . . and walked with a steady gate." [*Id.* at ¶ 23]. The short passage of time and the striking contrast between these two entries plainly implies that the Stamford Defendants discharged Sheehan prior to stabilizing her known emergency condition. The Complaint therefore pleads a viable failure to stabilize claim.

IV.     **Conclusion**

For the reasons set forth above, Defendants' Motion to Dismiss is DENIED and this case shall proceed in accordance with the Court's Scheduling Order.

                                        IT IS SO ORDERED.


                                        _____/s/_____
                                        Hon. Vanessa L. Bryant
                                        United States District Judge

Dated at Hartford, Connecticut: September 29, 2015