# STATE OF CONNECTICUT

## DEPARTMENT OF PUBLIC HEALTH

June 6, 2013

Mr. Brian Grissler, Administrator
Stamford Hospital
30 Shelburne Road
Stamford, CT 06904

Dear Mr. Grissler:

**This is an amended edition of the violation letter originally dated January 4, 2013.**

Unannounced visits were made to Stamford Hospital concluding on December 13, 2012 by representatives of the Facility Licensing and Investigations Section of the Department of Public Health for the purpose of conducting multiple investigations, a licensure and validation survey.

Attached are the violations of the Regulations of Connecticut State Agencies and/or General Statutes of Connecticut hich were noted during the course of the visits. The state violations cannot be edited by the provider in any way.

You may wish to dispute the violations and you may be provided with the opportunity to be heard. If the violations are not responded to by June 20, 2013 or if a request for a meeting is not made by the stipulated date, the violations shall be deemed admitted.

Please address each violation with a prospective plan of correction which includes the following components:

1. Measures to prevent the recurrence of the identified violation, (e.g., policy/procedure, inservice program, repairs, etc.).

2. Date corrective measure will be effected.

3. Identify the staff member, by title, who has been designated the responsibility for monitoring the individual plan of correction submitted for each violation.

We do not anticipate making any practitioner referrals at this time.

If there are any questions, please do not hesitate to contact this office at (860) 509-7400.

Respectfully,

Susan H. Newton, R.N.
Supervising Nurse Consultant
Facility Licensing and Investigations Section

SHN:jpf

Complaint #14730, #14236, #14639 and #14609.



*Phone: (860) 509-7400*
*Telephone Device for the Deaf (860) 509-7191*
*410 Capitol Avenue - MS # 12HSR*
*P.O. Box 340308 Hartford, CT 06134*
*An Equal Opportunity Employer*

DATES OF VISIT:    November 19, 20, 21, 22 and December 13, 2013

THE FOLLOWING VIOLATIONS OF THE REGULATIONS OF CONNECTICUT
STATE AGENCIES AND/OR CONNECTICUT GENERAL STATUTES
WERE IDENTIFIED

The following are violations of the Regulations of Connecticut State Agencies <u>Section 19-13-D3 (b)</u>
<u>Administration (2) and/or (c) Medical staff (2)(B)</u>.

1.  *Based on medical record reviews, review of facility documentation, and interviews for one of three
    patients reviewed for anticoagulation therapy (Patient #1), the attending physician failed to
    adequately supervise the patient's care. The finding includes:

    a.  Patient #1 had a history of atrial fibrillation (A-fib) on Warfarin therapy and was
        admitted to the hospital with sustained rapid ventricular rate (RVR) on 9/9/12. The
        patient received a one- time dose of Coumadin 5 mg by mouth on 9/9/12 at 4:24 PM per
        the order of MD #2 (3rd year Resident) and prophylactic Heparin 5,000 units every eight
        hours SQ was also initiated on 9/9/12 per MD #2's order. Amiodarone
        (cardiac-antiarrhythmic) was ordered by MD#2 on 9/10/12 to treat the RVR, as well as
        therapeutic Lovenox 90 mg every 12 hours SQ as a bridge anticoagulant. Blood work
        dated 9/10/12 indicated an International Normalized Ratio (INR-(clotting time)) of 2.5
        (normal for A-fib = 2-3). Progress notes dated 9/10/12 by the Attending Physician, MD
        #1, identified a plan for coronary artery bypass surgery. Progress notes by MD #1 dated
        9/11/12 and 9/12/12 indicated that the Patient's INR was high at 3.2 and 3.4 respectively.
        Although the patient's blood clotting capacity was decreasing, and potential for bleeding
        was increasing (high INR), physician's orders dated 9/11/12 and 9/12/12 did not include
        orders for anticoagulant medication adjustments. Medication Administration Records
        (MAR) noted that RN #10 held the Patient's Heparin at 10:00 PM on 9/12/12 and at 6:00
        AM on 9/13/12 and the Patient's Heparin was subsequently discontinued on 9/13/12.
        Nursing narratives and/or blood work and/or the brain scan dated 9/14/12 noted that
        although the Patient's INR level had decreased to 1.8, the Patient had a change in
        condition documented at 4:55 AM and was diagnosed with an acute left thalamic (brain)
        hemorrhage. Interview with MD #1 on 11/30/12 at 10:30 AM noted that although s/he
        reviewed Patient #1's medications, s/he missed that the patient was on Heparin and
        duplicate therapy, and discontinued the Heparin when s/he became aware. Interview
        with the Chair of Medicine, MD #5, on 11/29/12 at 1:48 PM identified that either, but
        not both, Heparin or Lovenox should have been used to treat the Patient.  MD #5 further
        indicated MD #1 was directly responsible for the Patient's care and oversight of MD #2.
        The hospital policy for resident supervision identified that attending physicians are
        responsible for the care provided to patients and that all residents, without exception,
        will function under the supervision of an attending physician. The hospital provided
        staff education and a revision of the computerized ordering system for the most current
        INR to automatically show on the computer screen when Lovenox is ordered (already in

DATES OF VISIT:      November 19, 20, 21, 22 and December 13, 2013

THE FOLLOWING VIOLATIONS OF THE REGULATIONS OF CONNECTICUT
STATE AGENCIES AND/OR CONNECTICUT GENERAL STATUTES
WERE IDENTIFIED

place for Heparin/Coumadin ordering).

The following are violations of the Regulations of Connecticut State Agencies Section 19-13-D3 (b)
Administration (2) and/or (c) Medical staff (2)(B) and/or (d) Medical Records (3) and/or (e) Nursing
service (1) and/or (i) General (6).

2.   *Based on review of the clinical record, review of hospital policies/procedures, review of hospital
documentation and interviews with hospital personnel for one patient (Patient #3) diagnosed with
an acute cerebrovascular accident (CVA) during an Emergency Department (ED) same day
readmission, documentation and interviews failed to reflect that the patient had continued
comprehensive medical oversight, failed to reflect ED policies that governed medical management
and failed to reflect that the case was formally reviewed in the hospital Quality Assurance
Performance Improvement (QAPI)process to ensure quality improvement and patient safety.  The
findings include:



a.   Review of the clinical record and interview with MD #11 identified that Patient #3 was
admitted to the hospital via ambulance on 7/7/12 at 1:24 AM with alcohol intoxication
and discharged to the ED waiting room at 7:26 AM after sobering appropriately.
Approximately 20 minutes later, Patient #3 was readmitted  at 7:50 AM, when he/she
was observed stumbling in the waiting room and noted to have an unsteady gait.

Review of the record and interview with RN #15 on 12/15/12 at 10:05 AM identified
that Patient #3 never left the waiting room on 7/7/12 and that, upon triage, the patient's
speech was baseline for him/her, a little slurred, and that the patient did not complain of
pain.

Review of the record and interview with RN #11 on 11/28/12 at 11:20 AM identified
that Patient #3 requested detoxification and that the patient's alcohol (ETOH) level was
261 (Normal zero) at 10:40 AM.  At 12:05 PM, eleven hours after the patient's initial
admission on 7/7/12, Patient #3 became agitated.  RN #11 indicated that the patient's
words were incomprehensible, that she notified MD #12, and that she administered
Ativan two milligrams (mg.) intravenously (IV) per physician order.  At 3:48 PM, RN
#11 identified that Patient #3 was now unable to stand without assistance and again
notified MD #12.

Interview with MD #12 on 12/12/12 at 10:45 AM identified that, although he completed
a reassessment of Patient #3 prior to end of his shift on 7/7/12, he failed to document the
assessment.  MD #12 indicated that Patient #3 was not weak, but was not able to stand
because he/she was still visibly intoxicated.  MD #12 stated that he/she signed off to MD
#10.

Review of the ED Physician Schedule identified that MD #10 was scheduled in the ED
on 7/7/12 from 2:30 PM to 10:30 PM.  Review of the record and interview with MD #10

DATES OF VISIT:   November 19, 20, 21, 22 and December 13, 2013

## THE FOLLOWING VIOLATIONS OF THE REGULATIONS OF CONNECTICUT STATE AGENCIES AND/OR CONNECTICUT GENERAL STATUTES WERE IDENTIFIED

on 12/11/12 identified that a dictated ED Physician Report was not completed for Patient #3 on 7/7/12. MD #10 indicated that Patient #3 was evaluated for oral intake (after RN request for a dinner meal). MD #10 indicated that it was a quick exam, that she could not recall any abnormalities but that the patient could eat. RN #11 documented that at 8:23 PM on 7/7/12, Patient #3 was still not able to stand and that the physician was aware.

Although Patient #3's words were now reported as incomprehensible and the patient could not stand, the record lacked documentation to reflect that a comprehensive medical evaluation of the patient's condition was provided. Interview with MD #10 on 12/11/12 identified that he/she could not recall any report of a change in the patient's condition or anything that would prompt another exam.

Patient #3 remained in the ED when MD #11 heard the patient loudly moaning at 4:30 AM on 7/8/12. After MD #11 evaluated the patient and identified neurological deficits, the patient underwent diagnostic radiologic studies that identified a large middle cerebral artery infarct. Patient #3 was not eligible for thrombolytic therapy as he/she did not meet the four and one half hour window criteria from symptom onset and subsequently expired on 7/11/12 at 1:26 PM. Review of the clinical record, review of hospital policies/procedures, review of hospital documentation and interviews with hospital personnel failed to reflect that ED medical care was comprehensively evaluated and that ED medical policy was implemented. In addition, the hospital governing body failed to ensure that care provided in the hospital ED by a contracted service was based on hospital policies approved by the governing body.

Subsequent to surveyor inquiry, the facility provided an immediate action plan that required a handwritten progress note, in addition to the dictated sign out note, be provided for the transfer of care so that the provider assuming the care of the patient would have immediate access to the workup provided to a patient prior to the transfer of care.

3.   *Based on review of facility documentation, manufacture's guidelines and interview, the facility failed to ensure that contracted services were provided in a safe manner.   The findings include:

   a.   Review of facility documentation related ti hemdialysis failed to identify that preventative maintenance of the portable reverse osmosis (RO) machines had been completed in accordance with manufacturers guidelines. Review of the maintenance log identified that the hemodialysis machines and RO was disinfected in July, August, and September of 2012. Interview with the Dialysis staff sated the RO was not disinfected in October or November but completed in an as needed basis. Interview with facility staff in 11/28/12 identified that the portable RO's do not require preventative maintenance.

   b.   Review of the manufactures guidelines for the WRO 95 re 04-2012 identified that the carbon/particle filter should be changed and the machine disinfected on a monthly basis,

DATES OF VISIT:     November 19, 20, 21, 22 and December 13, 2013

THE FOLLOWING VIOLATIONS OF THE REGULATIONS OF CONNECTICUT
STATE AGENCIES AND/OR CONNECTICUT GENERAL STATUTES
WERE IDENTIFIED

Every six months reject water from the RO should be monitored fir hardness, chlorine,
iron and temperature. Every six months the RO drain flow and the pure water flow
should be measured, conductivity checked and tubing and connectors checked.

The following are violations of the Regulations of Connecticut State Agencies Section 19-13-D3 (c)
Medical staff (2)(B) and/or (d) Medical Records (3).

4. Based on a review of the clinical record, staff interviews and a review of the facilities policies and
procedures for one of three sampled patients (Patient #34), the facility failed to obtain a
comprehensive physician's order for the use of oxygen in accordance with the hospital policy and/or
failed to obtain a physician's order for continuous pulse oximeter monitoring. The findings
included:

    a. Patient #34 was admitted to the hospital on 11/27/12 with a diagnosis that included
respiratory syncytial virus. Interview and review of the clinical record on 11/28/12 at
1:00 PM with MD #8 failed to identify the method of administration for oxygen, liter
flow, and the amount of oxygen to be delivered to Patient #34. MD #8 indicated it was
the responsibility of the physician to order oxygen therapy on admission that included
the mode of administration, liter flow, and the amount of oxygen to be administered.
Subsequent to the surveyor ' s inquiry an order was written for Patient #34 that directed
oxygen delivery for pulse oximeter monitoring that was less than ninety percent via
blow by at six liters per minute with oxygen administration at 100%. The hospital policy
for oxygen therapy directed in part that orders for oxygen therapy would specify the
method of administration, liter flow and amount of oxygen. Further review of the
hospital policy directed oxygen therapy would be administered following a physician ' s
order and documented in the patient ' s medical record.

    b. Tour of the pediatric unit on 11/28/12 at 11:30 AM identified Patient #34 was monitored
for oxygen levels via continuous pulse oximetry. Interview and review of the clinical
record with MD #8 on 11/28/12 at 1:00 PM failed to identify an order was obtained for
continuous pulse oximeter monitoring. Interview with Director #1 on 11/28/12 at 2:45
PM indicated an order should have been initiated on admission for continuous pulse
oximeter monitoring that directed the use of oxygen to maintain oxygen saturations
levels above ninety percent. Subsequent to the surveyor ' s inquiry an order for
continuous pulse oximeter monitoring was initiated. The hospital failed to have a policy
that directed the use and/or frequency of pulse oximeter monitoring.

The following are violations of the Regulations of Connecticut State Agencies Section 19-13-D3 (c)
Medical staff (2)(B) and/or (d) Medical Records (3).

DATES OF VISIT:    November 19, 20, 21, 22 and December 13, 2013

### THE FOLLOWING VIOLATIONS OF THE REGULATIONS OF CONNECTICUT STATE AGENCIES AND/OR CONNECTICUT GENERAL STATUTES WERE IDENTIFIED

5.  Based on a review of the clinical record and staff interviews for three of three sampled patients (Patient #34, #36 and #40), the facility failed to prescribe dietary orders for the patient. The findings included:

    a.  Tour of the pediatric unit on 11/28/12 at 11:30 AM identified Patient #36 was bottle feeding.  Interview and review of the clinical record with RN #6 indicated the diet order for Patient #36 was identified as regular. RN #6 indicated the orders were written as a regular diet so the parent of the patient would receive a meal. Interview with Director #1 on 11/28/12 at 2:50 PM identified the diet order should be the patient ' s order and not an order for the parent. Subsequent to the surveyors inquiry a physician's order was initiated for the use of formula.

    b.  Interview and review of the clinical record with RN #6 on 11/28/12 at 11:40 AM identified Patient #34 was on a regular diet. Further interview with the RN #6 indicated Patient #34 was breast feeding and regular diet orders were written so the parent would receive a meal. Interview with Director #1 on 11/28/12 at 2:50 PM identified diet orders should be written that reflected the patient ' s diet. Subsequent to the surveyors inquiry breast feeding was ordered as the diet for Patient #34.

    c.  Patient # 40 was a full term infant delivered on 11/26/12. Review of the clinical record with RN #8 on 11/28/12 at 10:30 AM identified physician ' s orders directed breast and bottle feeding. Interview with Nurse Manager #2 on 11/28/12 at 10:35 AM indicated infant feeding orders were routinely written as breast and bottle so the physician would not be disturbed in the middle of the night for a change in diet order. Interview with Director #1 on 11/28/12 at 2:45 PM identified physician orders should reflect one diet order and the physician should be notified if an order change is needed for a medical indication and/or a maternal request.

The following are violations of the Regulations of Connecticut State Agencies <u>Section 19-13-D3 (c)</u> <u>Medical staff (2)(B) and/or (d) Medical Records (3) and/or (e) Nursing staff (1).</u>

6.  Based on medical record reviews and interviews for one of three patients reviewed for intravenous (IV) therapy administration (Patient #26), nursing staff failed to follow the physician's IV order. The finding includes:

    a.  Patient #26 had upper and lower endoscopic procedures performed on 11/27/12. Physician orders dated 11/27/12 directed an IV of Lactated Ringers solution at 125 cc/hour. Review of nursing documentation with the Nurse Manager on 11/27/12 at approximately 10:30 AM noted that although the correct IV had been started by the nurse on 11/27/12 at 8:09 AM, the IV had infused at a rate of 100 cc/hour preoperatively and postoperatively instead of the rate of 125 cc/hour as ordered.

DATES OF VISIT:    November 19, 20, 21, 22 and December 13, 2013

THE FOLLOWING VIOLATIONS OF THE REGULATIONS OF CONNECTICUT
STATE AGENCIES AND/OR CONNECTICUT GENERAL STATUTES
WERE IDENTIFIED

The following are violations of the Regulations of Connecticut State Agencies <u>Section 19-13-D3 (d)</u>
<u>Medical Records (3) and/or (e) Nursing staff (1)</u>.

7.  Based on review of the clinical record, interview and policy review the facility failed to ensure that
pain assessments for one (Patient #19) were completed in accordance with hospital protocol and/or
that one patient who required hemodialysis (#18) was weighed following treatment. The findings
include the following:



   a.  Patient #19 was admitted to the rehab unit on 11/25/12 after a laminectomy/fusion.
Review of the clinical record indicated that on 11/26/12 at 8:00 AM the patient had a
pain level of of 7 on a 1-10 scale (10 being the worst possible pain). The patient had a
pain level of 7 at 10:24 AM and was treated with Oxy IR. A reassessment at 11:30 AM
identified the patient rated pain as a 2. The clinical record indicated that the patient was
next assessed nine and half hours later at 8:00 PM and was identified to have a pain
level of 5 and assessed again at 11/27/12 at 8:00 AM for a pain level of 7.  Interview
with staff identified that pain assessments should be completed every four hours and that
the order in the computer had not been updated.

   b.  Review of Patient #18's clinical record indicated that the patient was receiving
hemodialysis.  The patient was admitted with fluid overload.  Review of the flow sheets
dated 11/23/12, 11/24/12 and 11/25/12 failed to identify that the patient had been
weighed after the dialysis treatment.  Interview with staff on 11/28/12 identified that
weights are not completed after dialysis unless ordered by the physicians and that the
physicians calculate fluid removed. Interview with the Director of Risk on 12/7/12 at
10:00 AM indicated that there is no policy for hemodialysis assessments. Interview with
the Attending physician on 12/13/12 at 11:15 AM identified that patients should be
weighed after each hemodialysis treatment.

The following is a violation of the Regulations of Connecticut State Agencies <u>Section 19-13-D3 (g)</u>
<u>Pharmacy (6)</u>.

8.  Based on observation, review of hospital policy and interview with hospital personnel regarding
medication room access, documentation and interviews failed to reflect that the medication supply
room and storage was secure. The findings include:

   a.  During tour of the telemetry unit on 11/26/12 at 11:10 AM,  a central supply medical
technician was observed stocking supplies in the medication room without a licensed
nurse present. Interviews with the charge nurse, RN #1, and the Risk Manager at the
time of the observation identified that a licensed nurse must be present when the
technician was in the medication room.

The following are violations of the Regulations of Connecticut State Agencies <u>Section 19-13-D3 (d)</u>
<u>Medical Records (3) and/or (e) Nursing staff (1) and/or (i) General (6)</u>.

DATES OF VISIT:   November 19, 20, 21, 22 and December 13, 2013

THE FOLLOWING VIOLATIONS OF THE REGULATIONS OF CONNECTICUT
STATE AGENCIES AND/OR CONNECTICUT GENERAL STATUTES
WERE IDENTIFIED

9. Based on a review of the clinical record, staff interviews and a review of the facilities policies and
procedures for one patient (Patient #40), the facility failed to document intake and/or failed to
identify the location of the infant. The findings included:

    a. Patient # 40 was a full term infant delivered on 11/26/12. Review of the clinical record
with RN #8 on 11/28/12 at 10:30 AM identified physician's orders directed breast and
bottle feeding. Interview and review of the clinical record on 11/28/12 at 10:35 AM with
RN #8 failed to identify feedings were provided and/or documented on 11/27/12 from
7:45 PM through 11/28/12 at 9:45 AM. Further interview and review of the clinical
record with RN #8 indicated the infant had six feedings in twenty four hours. Interview
with the lactation consultant on 11/28/12 at 12:50 PM identified normal breast feeding
frequency is eight to twelve times in a twenty four hour period. The hospital policy for
breast feeding indicated frequent feeding would assist in the development of a full milk
supply.



Interview and review of the clinical record with RN #8 on 11/28/12 at 10:40 AM
indicated the location of the infant was only identified at the time of the neonatal
assessment and did not discern if the mother infant dyad were together or if the infant
was in the nursery. Interview with Director #1 on 11/28/12 at 3:00 PM indicated the
location of the infant should be identified in the clinical record at all times and was not.
The hospital policy for breastfeeding directed in part that mothers would be encouraged
to stay together whenever possible to facilitate frequent feedings at the breast. The
policy further identified that rooming in would assist parents in the identification of
feeding cues.

The following are violations of the Regulations of Connecticut State Agencies Section 19-13-D3 (d)
Medical Records (3) and/or (e) Nursing staff (1) and/or (i) General (6).

10. Based on a review of the clinical record, policy review and interviews, the facility failed to ensure
that a comprehensive care plan was completed for one patient (Patient #18). The finding includes
the following:

    a. Review of Patient #18's clinical record indicated that the patient was admitted with fluid
overload and required hemodialysis. Interview with the RN on 11/27/12 indicated that
the patient had a fistula placed in 2011 but was very nervous and hesitant to start
hemodialysis. The patient was started on a renal diet. Review of the clinical record on
11/27/12 with the Manager and staff identified that the patient had a nutrition consult
completed by dietary on 11/27/12 that identified that the patient had no nutritional needs
at this time. Review of the care plan identified that the patients active problems
included Infection, knowledge deficit and alteration in renal perfusion related to
hypovolemia. The care plan failed to address the patient's potential nutrition issues

DATES OF VISIT:    November 19, 20, 21, 22 and December 13, 2013

THE FOLLOWING VIOLATIONS OF THE REGULATIONS OF CONNECTICUT
STATE AGENCIES AND/OR CONNECTICUT GENERAL STATUTES
WERE IDENTIFIED

and/or fluid overload status.

Review of the policy indicated that the care plan should be individualized and serves as
a guide for defining care and promoting discharge planning.

The following are violations of the Regulations of Connecticut State Agencies Section 19-13-D3 (c)
Medical staff (2)(B) and/or (e) Nursing staff (1).

11. Based on medical record reviews and interviews for one of three patients reviewed for intravenous
    (IV) therapy administration (Patient #25), the record lacked a physician's order for IV
    administration. The finding includes:
    a. Patient #25 had upper and lower endoscopic procedures performed on 11/27/12. Nursing
       documentation indicated that an IV of Lactated Ringers was started by the nurse at 7:18
       AM in the left arm. Review of the patient's record with the Nurse Manager on 11/27/12
       at approximately 10:30 AM noted that an IV order had not been written or entered into
       the computer by the physician to direct the administration of the IV. Interview with the
       Nurse Manager at this time noted that the Anesthesiologist was responsible for IV orders
       unless the Anesthesiologist started the IV.

The following are violations of the Regulations of Connecticut State Agencies Section 19-13-D3 (b)
Administration (2) and/or (c) Medical staff (2)(B) and/or (g) Pharmacy (4) and/or (i) General (6).

12. *Based on medical record reviews, review of facility documentation, and interviews for one of three
    patients reviewed for anticoagulation therapy (Patient #1), the pharmacist failed to ensure safe
    medication administration. The finding includes:
    a. Patient #1 had a history of atrial fibrillation (A-fib) was on Warfarin therapy and
       admitted to the hospital with sustained rapid ventricular rate (RVR) on 9/9/12. The
       physician's order dated 9/9/12 by MD #2 (3rd year Resident) directed Heparin
       (anticoagulant) 5,000 units every eight hours SQ as prophylactic therapy to prevent
       thrombus formation (blood clot). Therapeutic Lovenox (anticoagulant) 90 mg every 12
       hours SQ was ordered by MD #2 and approved by the pharmacist, MD #3, on 9/10/12.
       Blood work dated 9/10/12 indicated an International Normalized Ratio (INR-(clotting
       time)) of 2.5 (normal for A-fib = 2-3). Blood work dated 9/11/12 and 9/12/12 indicated
       that the Patient's INR was high at 3.2 and 3.4 respectively. Although the patient's
       Heparin was held at 10:00 PM on 9/12/12 and at 6:00 AM on 9/13/12 and was
       subsequently discontinued on 9/13/12, the Patient had a change in condition on 9/14/12
       at 4:55 AM and was diagnosed with an acute left thalamic (brain) hemorrhage. Interview
       with the Director of Pharmacy, MD #4, on 11/28/12 at 1:30 PM identified that before a
       medication can be dispensed, the medication order must be approved by a pharmacist.
       MD #4 indicated that when a physician orders a duplicate therapy medication, the

THE FOLLOWING VIOLATIONS OF THE REGULATIONS OF CONNECTICUT
STATE AGENCIES AND/OR CONNECTICUT GENERAL STATUTES
WERE IDENTIFIED

physician must enter a reason for the duplicate therapy. MD #4 noted that although the
ordering physician entered that the patient was being monitored as the reason for the
duplicate therapy, MD #3 should have questioned further and called the ordering
physician. The hospital pharmacy job description identified that a critical responsibility
of the pharmacist was to ensure appropriateness of therapy and dose for all patient
populations. The hospital provided staff education and revision of the computerized
ordering system for the most current INR to automatically show on the computer screen
when Lovenox is ordered (already in place for Heparin/Coumadin ordering).

The following are violations of the Regulations of Connecticut State Agencies Section 19-13-D3 (a)
Physical plant (1)(2)(4) and/or (b) Administration (2) and/or (i) General (6).

13. Based on observation on 11/26/12 during a tour of the third floor (seventeen patients),
Whittingham/Special Care Pavilion, Maternity and Women's Health Unit from 10:25 AM till 11:30
AM the surveyor accompanied by Director Safety and Security Department and the Executive
Director of Facilities Management observed the following:

   a. The means of egress on the patient occupied third floor (seventeen patients),
      Whittingham/Special Care Pavilion, Maternity and Women's Health Unit were not
      maintained free of all obstructions or impediments to full instant use in the case of fire
      or other emergency; i.e., production equipment and furniture for the filming of a TV
      show was in use and/or stored in exit corridors of the unit.
   b. Door closers were not provided on the doors to the patient care rooms on the patient
      occupied third floor (seventeen patients), Whittingham/Special Care Pavilion, Maternity
      and Women's Health Unit that were utilized as storage rooms by a production
      company for the filming of a TV show in order to maintain the required smoke
      resistance assembly in an opening to a hazardous area.
   c. The smoke barrier doors in the Maternity and Women's Health Unit were obstructed
      from closing by production equipment, belonging to a production company for the
      filming of a TV show that did not allow the doors to automatically close when released
      from the magnetic hold open devices.

The following are violations of the Regulations of Connecticut State Agencies Section 19-13-D3 (a)
Physical plant (1)(2)(4) and/or (b) Administration (2) and/or (i) General (6).

14. Based on document review on 11/26/12 at 12:30 PM, the Director Safety and Security Department
and the Executive Director of Facilities Management did not provide the surveyors with
documentation to indicate that electrical equipment used by a production company for the filming
of a TV show on the patient occupied third floor (seventeen patients), Whittingham/Special Care
Pavilion, Maternity and Women ' s Health Unit were inspected as required in NFPA 99, Section

DATES OF VISIT:     November 19, 20, 21, 22 and December 13, 2013

### THE FOLLOWING VIOLATIONS OF THE REGULATIONS OF CONNECTICUT STATE AGENCIES AND/OR CONNECTICUT GENERAL STATUTES WERE IDENTIFIED

7-5.1.3., 7-5.2.2.1 and 7-6.2.1.2 and as part of the facilities preventive maintenance program; i.e., inspection and/or testing for physical integrity, resistance, leakage current tests and chassis leakage current was not conducted and recorded by the facility before the equipment was put into service by the production company.

The following are violations of the Regulations of Connecticut State Agencies <u>Section 19-13-D3 (b)</u> <u>Administration (2) and/or (c) Medical staff (2)(B) and/or (e) Nursing service (1) and/or (i) General (6).</u>

15. Based on a tour of the operative suite, review of hospital policies, observations and interviews, the hospital failed to ensure proper donning of surgical attire and/or that opened multi-dose vials were dated and/or that endoscopes were dried/stored in a sanitary manner. The finding includes:

    a. A tour of operating room (OR) #1 was conducted with the Director of the OR on 11/26/12 at 10:24 AM. Observation on 11/26/12 at 10:24 AM noted the Circulating Nurse leaning over or standing next to the sterile field while performing the initial count procedure with his/her hair exposed at the back and sides of the bouffant hair covering. Subsequent to surveyor inquiry and management staff intervention, the Circulating Nurse's hair was placed beneath the bouffant and hair was no longer exposed. The hospital policy for surgical attire identified that the surgical head covering should be clean, low lint and confine all hair and scalp skin.

    b. A tour of the OR was conducted with the Director of the OR on 11/26/12 at 10:24 AM. Observation of one of two anesthesia carts noted that one anesthesia cart contained four vials of Succinylcholine and one vial was opened. Although the vial was dated with the 30 day expiration date from the time the vial was removed from refrigeration, the date that the vial was opened was written on the vial with black marker, was smudged and unreadable. Interview with the Anesthesiologist on 11/26/12 at 10:30 AM indicated that s/he utilized the anesthesia cart for a prior case and did not notice the opened vial of Succinylcholine or s/he would have discarded the vial. The multi-dose vial policy identified that multi-dose vials are to be labeled to expire 28 days after the initial entry.

    c. A tour of the hospital central sterile department was conducted on 11/26/12 at 11:50 AM. Observation on 11/26/12 at 11:50 AM noted that the tips of 2 of 3 processed endoscopes rested on the moist drip cloth beneath the scopes in the scope cabinet. The observation also indicated that due to the shortness of the storage cabinet, the scopes could not be fully extended during the drying process. Subsequently, the 2 scopes were looped differently by the CSD worker so that the tips of the scopes no longer touched the drip cloth. Review of the hospital policy for endoscopic cleaning and processing lacked direction for endoscope drying and storage. According to the Society of Gastroenterology Nurses, Inc., Standards of Infection Control in Reprocessing of Flexible Gastrointestinal Endoscopes Copyright © 2008, Hang the endoscope vertically with the distal tip hanging freely in a well-ventilated, dust-free area. A storage area with good ventilation will encourage continued air drying of the surfaces, and prevent undue moisture build-up, thus discouraging any microbial contamination.

Case 3:14-cv-00970-VLB   Document 59-1   Filed 02/05/16   Page 12 of 76

DATES OF VISIT:     November 19, 20, 21, 22 and December 13, 2013

THE FOLLOWING VIOLATIONS OF THE REGULATIONS OF CONNECTICUT
STATE AGENCIES AND/OR CONNECTICUT GENERAL STATUTES
WERE IDENTIFIED

The following are violations of the Regulations of Connecticut State Agencies <u>Section 19-13-D3 (b)</u>
<u>Administration (2) and/or (l) Infection control (1)(A).</u>

16. Based on tour and interview the facility failed to ensue that the infection control staff were included
in a project that would be completed on the maternity unit with the use of contracted staff.   The
finding includes the following:



   a. Tour of the postpartum maternity unit (census of 17 patients inclusive of mothers and
   newborns) on 11/26/12 at 10:30 am identified approximately 30-35 production company
   staff filming of a TV show.  The production company had equipment spread throughout
   the unit for filming purposes. Interview with the Manager on 11/26/12 at 11:00 AM
   identified that the hospital's Infection Prevention staff were not consulted in preparation
   for this event.
   Interview with the Infection Prevention staff on 11/29/12 identified that they were not
   aware that filming was being completed in the hospital and that they should have been
   notified prior to the event.  The Hospital provided the Department with an immediate
   action plan dated 11/26/12 that identified key departments were not included in the walk
   through or approval process and subsequently developed to manage this approval
   process.

   Review of the policy, "Medical Requirement Guidelines for Temporary Personnel,"
   identified that temporary non-clinicians include contractors or employees of other
   companies who do not have patient contact or clinical responsibilities. For personnel in
   a patient treatment area, personnel are required to provide PPD/TB surveillance
   requirements, including proof of measles, mumps, rubella, and varicella.

The following is a violation of the Regulations of Connecticut State Agencies <u>Section 19-13-D3 (i)</u>
<u>General (6).</u>

17. Based on medical record reviews, review of hospital policies and interviews for two of three
patients (Patients #28, #29), radiology staff failed to perform a pregnancy screen prior to
radiological testing. The finding includes:

   a. Patients #28 and #29 each had a mammography followed by ultrasound on 11/27/12.
   Review of each Patient's questionnaire for both tests with Radiology Staff on 11/27/12 at
   approximately 10:40 AM noted that the questions of "last menstrual period" and "are
   you pregnant" were left blank and identified that the patients did not have a
   hysterectomy or ovaries removed. Interview with Radiology Staff on 11/27/12 indicated
   that the entire questionnaire should be completed by radiology staff for all females of
   childbearing age. The hospital policy for radiation safety directed to screen all females,
   regardless of age who are menstruating and in general are between the ages of 11 and 55
   to ascertain pregnancy prior to procedures using ionizing radiation.

THE FOLLOWING VIOLATIONS OF THE REGULATIONS OF CONNECTICUT
STATE AGENCIES AND/OR CONNECTICUT GENERAL STATUTES
WERE IDENTIFIED

The following are violations of the Regulations of Connecticut State Agencies Section 19-13-D3 (a) Physical plant (1)(2)(4) and/or (b) Administration (2) and/or (i) General (6).

18. The facility did not ensure that soled linen or trash collection receptacles do not exceed 32 gal (121 L) in capacity and Mobile soiled linen or trash collection receptacles with capacities greater than 32 gal (121 L) are located in a room protected as a hazardous area when not attended as required by the referenced LSC.

   a. On 11/26/12 at various times throughout the survey the surveyor, accompanied by the Director of Engineering, observed that mobile soiled linen or trash collection receptacles with capacities greater than 32 gal (121 L) being utilized throughout the entire facility were not located in a room protected as a hazardous area when not attended as required by the referenced LSC standard.

   b. On 11/26/12 at 12:30 PM, the Director Safety and Security Department and the Executive Director of Facilities Management did not provide the surveyor with documentation to indicate that electrical equipment used by a production company for the filming of a TV show on the patient occupied third floor (seventeen patients), Whittingham/Special Care Pavilion, Maternity and Women's Health Unit were inspected as required in NFPA 99, Section 7-5.1.3., 7-5.2.2.1 and 7-6.2.1.2 and as part of the facilities preventive maintenance program; i.e., inspection and/or testing for physical integrity, resistance, leakage current tests and chassis leakage current was not conducted and recorded by the facility before the equipment was put into service by the production company.



**STAMFORD HOSPITAL**
The Regional Center for Health

*Affiliate* Columbia University-College of Physicians & Surgeons
*Member* NewYork-Presbyterian Healthcare System

A Planetree Hospital

Discover More

Accepted
6/24/13
SHN

30 Shelburne Road
P.O. Box 9317
Stamford CT 06904-9317
203.276.1000
www.stamhealth.org

June 19, 2013

RECEIVED
JUN 21 2013
DEPT. OF PUBLIC HEALTH
FACILITY LICENSING & INVESTIGATIONS SECTION

Susan Newton RN.
Supervising Nurse Consultant
Facility Licensing and Investigation Section
State of Connecticut
Department of Public Health
410 Capital Avenue, P.O. Box 340308
Hartford, CT 06134

Dear Ms. Newton:

Enclosed is Stamford Hospital's Plan of Correction that is being submitted in response to the alleged violations cited in your amended edition of the violation letter dated June 6, 2013.
Should you have questions or need additional information, please contact Elizabeth McKinlay at (203) 276-4147.

Sincerely,

Brian Grissler
President & CEO

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| The following are violations of the Regulations of Connecticut State Agencies Section 19-13-D3 (b) Administration (2) and/or (c) Medical staff (2)(B).<br><br>1.       *Based on medical record reviews, review of facility documentation, and interviews for one of three patients reviewed for anticoagulation therapy (Patient #1), the attending physician failed to adequately supervise the patient's care. The finding includes:<br>a.       Patient #1 had a history of atrial fibrillation (A-fib) on Warfarin therapy and was admitted to the hospital with sustained rapid ventricular rate (RVR) on 9/9/12. The patient received a one- time dose of Coumadin 5 mg by mouth on 9/9/12 at 4:24 PM per the order of MD #2 (3rd year Resident) and prophylactic Heparin 5,000 units every eight hours SQ was also initiated on 9/9/12 per MD #2's order. Amiodarone (cardiac-antiarrhythmic) was ordered by MD#2 on 9/10/12 to treat the RVR, as well as therapeutic Lovenox 90 mg every 12 hours SQ as a bridge anticoagulant. Blood work dated 9/10/12 indicated an International Normalized Ratio (INR-(clotting time)) of 2.5 (normal for A-fib = 2-3). Progress notes | The Hospital responds as follows:<br><br>**Medicine**<br><br>A meeting was held on October 3, 2012 that included the Hospital's Chief Medical Officer, VP Enterprise Risk Management, Chief Quality Officer, and Director of Regulatory Affairs to discuss this case. A special Meeting of a subcommittee of the Medical Peer Review Committee of Stamford Hospital met for further review.  A formal root cause analysis  was also conducted which included the Chair of Medicine (MD #5), Director of Hospitalist Services, Director of Critical Care, Nursing Manager of Telemetry, Senior VP Patient Care Services, Risk Management Associate, Director of Operations, and the Medical Affairs Department. | Chair of Medicine, Director of Hospitalist Service and Director of Pharmacy | December 31, 2012 | The Pharmacy staff will conduct daily monitoring of warfarin therapy patients and will include review of the patient's profile (medication history) for any other anticoagulant orders used as a bridge for duplication. The results of monitoring will be reported to Pharmacy and Therapeutic committee monthly. |

RECEIVED JUN 2 1 2013 FACILITY LICENSING & INVESTIGATIONS SECTION DEPT. OF PUBLIC HEALTH

1

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| dated 9/10/12 by the Attending Physician, MD #1, identified a plan for coronary artery bypass surgery. Progress notes by MD #1 dated 9/11/12 and 9/12/12 indicated that the Patient's INR was high at 3.2 and 3.4 respectively. Although the patient's blood clotting capacity was decreasing, and potential for bleeding was increasing (high INR), physician's orders dated 9/11/12 and 9/12/12 did not include orders for anticoagulant medication adjustments. Medication Administration Records (MAR) noted that RN #10 held the Patient's Heparin at 10:00 PM on 9/12/12 and at 6:00 AM on 9/13/12 and the Patient's Heparin was subsequently discontinued on 9/13/12. Nursing narratives and/or blood work and/or the brain scan dated 9/14/12 noted that although the Patient's INR level had decreased to 1.8, the Patient had a change in condition documented at 4:55 AM and was diagnosed with an acute left thalamic (brain) hemorrhage. Interview with MD #1 on 11/30/12 at 10:30 AM noted that although s/he reviewed Patient #1's medications, s/he missed that the patient was on Heparin and duplicate therapy, and discontinued the Heparin when s/he became aware. Interview with the Chair of Medicine, MD #5, on | The Chair of Medicine (MD #5) made a presentation to all House Staff members, in attendance at Medical Grand Rounds on November 28, 2012, on the importance of medication reconciliation, and the imperative of understanding the use, dosage, and potential side effects of all of the medications that they prescribe, in addition to all potential drug interactions. The Chair of Medicine (MD #5) reminded the attendees that all medications are to be reviewed regularly and continually, and no less frequently than on a daily basis.

If there are any physician questions, the Pharmacy Department is always available to discuss any issues or concerns that may arise. The Chair of Medicine (MD #5) stated that the relevance of pharmacologic management of | | | |

2

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| 11/29/12 at 1:48 PM identified that either, but not both, Heparin or Lovenox should have been used to treat the Patient.  MD #5 further indicated MD #1 was directly responsible for the Patient's care and oversight of MD #2. The hospital policy for resident supervision identified that attending physicians are responsible for the care provided to patients and that all residents, without exception, will function under the supervision of an attending physician. The hospital provided staff education and a revision of the computerized ordering system for the most current INR to automatically show on the computer screen when Lovenox is ordered (already in place for Heparin/Coumadin ordering). | patients is regularly and systematically interwoven into clinical rounds and clinical case discussions, which occur regularly and continually in the course of patient care.<br><br>The Director of the Hospitalist Service discussed the necessity to review the daily medications on each patient at the October 30, 2012 hospitalist staff meeting.<br><br>**Supervision & Oversight**:<br><br>In addition to more structured interdisciplinary rounding, new daily Academic Teaching Rounds have been instituted at the Hospital to include a Hospitalist/Family Medicine/Internal Medicine physicians and residents; Interdisciplinary rounds existed for several years and included the Hospitalist, nurses, case managers and other healthcare team | | | |

3

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| | members. A more structured interdisciplinary round were started in January 2013 and focuses on the patient in general but also reviews vaccine status, deep vein thrombosis prophylaxis and current medications. Academic Teaching Rounds started in January 2013 reviews all hospital and resident patients care, provide clinical education and includes reviews of patient medications.<br><br>**Computerized Ordering System:**<br><br>The pharmacy has added an INR level in the Computerized Physician Order Entry (CPOE) system so that whenever Lovenox is ordered, the current INR level will pop-up to inform the physician/pharmacist of the current INR. PT/INR/PTT is already added to Coumadin. This will enable the | | | |

4

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| | physician/pharmacist to be better informed when making decisions regarding Lovenox therapy.<br><br>All overrides of pop-ups on the CPOE system signaling duplicate anticoagulant therapy will be followed-up by the pharmacist with a phone call to the ordering MD to discuss the order.<br><br>The organization will evaluate a Physician Desktop feature which can be added to the Meditech medication ordering system. This allows pharmacy staff and physicians to send secure messages to each other regarding medication issues and is available with the upgrade to the Meditech medication ordering system in 2013.  Clinical leadership at the Hospital is reviewing the necessity of providing a "pop up" in the CPOE system suggesting that the prescriber | | | |

5

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| | of Amiodarone order a baseline INR with initiation of this medication. | | | |
| The following are violations of the Regulations of Connecticut State Agencies Section 19-13-D3 (b) Administration (2) and/or (c) Medical staff (2)(B) and/or (d) Medical Records (3) and/or (e) Nursing service (1) and/or (i) General (6).<br><br>2.    *Based on review of the clinical record, review of hospital policies/procedures, review of hospital documentation and interviews with hospital personnel for one patient (Patient #3) diagnosed with an acute cerebrovascular accident (CVA) during an Emergency Department (ED) same day readmission, documentation and interviews failed to reflect that the patient had continued comprehensive medical oversight, failed to reflect ED policies that governed medical management and failed to reflect that the case was formally reviewed in the hospital Quality Assurance Performance Improvement (QAPI)process to ensure quality improvement and patient safety. The | The Hospital responds as follows:<br><br>**Formal Case Review; ED QAPI:**<br><br>The case met ED QAPI "72 hour returns for admission" screening criteria, but was not forwarded to the ED QAPI review committee. Effective December 2012, any case meeting ED QAPI review screening criteria, and which subsequently results in mortality within 72 hours, will undergo full review by the ED QAPI review committee.<br><br>All cases currently identified by ED QAPI screening criteria are reviewed by the ED Quality Director for potential errors in medical management. | ED Physician Chair | April 30, 2013 | The revised processes will be reviewed by the organization's Peer Review Oversight Committee<br><br>Root Cause analysis action plan is reported to PSQC and QCAC. |

6

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| findings include:<br>a.      Review of the clinical record and interview with MD #11 identified that Patient #3 was admitted to the hospital via ambulance on 7/7/12 at 1:24 AM with alcohol intoxication and discharged to the ED waiting room at 7:26 AM after sobering appropriately. Approximately 20 minutes later, Patient #3 was readmitted at 7:50 AM, when he/she was observed stumbling in the waiting room and noted to have an unsteady gait.<br><br>Review of the record and interview with RN #15 on 12/15/12 at 10:05 AM identified that Patient #3 never left the waiting room on 7/7/12 and that, upon triage, the patient's speech was baseline for him/her, a little slurred, and that the patient did not complain of pain.<br><br>Review of the record and interview with RN #11 on 11/28/12 at 11:20 AM identified that Patient #3 requested detoxification and that the patient's alcohol (ETOH) level was 261 (Normal zero) at 10:40 AM.  At 12:05 PM, eleven hours after the patient's initial admission on 7/7/12, Patient #3 became agitated.  RN #11 indicated that the patient's | If an error had potentially occurred, the case is fully reviewed by the ED QAPI committee. Effective December 2012, any case which meets ED QAPI screening criteria and that contains inadequate documentation (independent of potential error) will be referred to the ED QAPI committee for full review.  A list of all cases identified for review will be maintained by ED Department, along with the disposition of the review.<br><br>The case is undergoing a comprehensive root cause analysis.  Results of the root cause analysis and corrective action will be reported to the organization's quality oversight structure, the Patient Safety and Quality Committee (PSQC).  Results of the case review at the PSQC will be reviewed at the Quality and Clinical Affairs Committee | | | |

7

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| words were incomprehensible, that she notified MD #12, and that she administered Ativan two milligrams (mg.) intravenously (IV) per physician order.  At 3:48 PM, RN #11 identified that Patient #3 was now unable to stand without assistance and again notified MD #12.

Interview with MD #12 on 12/12/12 at 10:45 AM identified that, although he completed a reassessment of Patient #3 prior to end of his shift on 7/7/12, he failed to document the assessment.  MD #12 indicated that Patient #3 was not weak, but was not able to stand because he/she was still visibly intoxicated.  MD #12 stated that he/she signed off to MD #10.

Review of the ED Physician Schedule identified that MD #10 was scheduled in the ED on 7/7/12 from 2:30 PM to 10:30 PM.  Review of the record and interview with MD #10 on 12/11/12 identified that a dictated ED Physician Report was not completed for Patient #3 on 7/7/12. MD #10 indicated that Patient #3 was evaluated for oral intake (after RN request for a dinner meal).  MD #10 indicated that it was a quick exam, that she could not recall any abnormalities but that | (QCAC) of the Board of Directors.

The Clinical Chair of the ED will attend a seminar on medical staff leadership, sponsored by a major national legal firm with expertise in this area.  The curriculum will include a number of physician leadership related topics, including management of organizational peer review processes.

**Comprehensive Medical Oversight:**

Patient #3 had a long history of treatment in the Hospital ED for alcohol related and psychiatric conditions  having been previously treated in the ED 20 times (resulting in eight Hospital admissions) within the six months before 7/7/12, leaving against medical advice on several occasions.  As a result, Patient #3 was well | | | |

8

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implemen | Measurement Strategy |
|---|---|---|---|---|
| the patient could eat.  RN #11 documented that at 8:23 PM on 7/7/12, Patient #3 was still not able to stand and that the physician was aware. Although Patient #3's words were now reported as incomprehensible and the patient could not stand, the record lacked documentation to reflect that a comprehensive medical evaluation of the patient's condition was provided.  Interview with MD #10 on 12/11/12 identified that he/she could not recall any report of a change in the patient's condition or anything that would prompt another exam. Patient #3 remained in the ED when MD #11 heard the patient loudly moaning at 4:30 AM on 7/8/12.  After MD #11 evaluated the patient and identified neurological deficits, the patient underwent diagnostic radiologic studies that identified a large middle cerebral artery infarct.  Patient #3 was not eligible for thrombolytic therapy as he/she did not meet the four and one half hour window criteria from symptom onset and subsequently expired on 7/11/12 at 1:26 PM.  Review of the clinical record, review of hospital policies/procedures, review of hospital documentation and interviews with hospital | known to Hospital ED and social work staff  prior to presentation in the early morning hours of 7/7/12 after ingesting a large quantity of vanilla extract The physicians caring for the patient stated that they assessed and re-assessed the patient during their shifts, signed-out to oncoming physicians at the end of their shift, and MD #11 stated she did a neurological exam on the patient.  Medical Screening was provided to the patient by all three (3) physicians. **ED policies that govern medical management:** The Hospital disagrees with the findings that the ED failed to have specific policies to govern medical care of patients in the ED. The ED did have a specific hand-off policy in place. | | | |

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| personnel failed to reflect that ED medical care was comprehensively evaluated and that ED medical policy was implemented. In addition, the hospital governing body failed to ensure that care provided in the hospital ED by a contracted service was based on hospital policies approved by the governing body.<br><br>Subsequent to surveyor inquiry, the facility provided an immediate action plan that required a handwritten progress note, in addition to the dictated sign out note, be provided for the transfer of care so that the provider assuming the care of the patient would have immediate access to the workup provided to a patient prior to the transfer of care. | As of December 11, 2012, all ED patients signed out to another ED physician require a handwritten progress note in addition to a dictated sign-out note. This documentation includes the presenting complaint, pertinent physical exam findings (positive or negative), pertinent labs, and indication for transfer of care (sign-out). This form will be completed by the physician signing out the patient, for the provider assuming care to have immediate access to the patient's medical care information that has occurred prior to transfer of care. This form is mandatory for all physician sign-outs.<br><br>The existing ED physician-to-physician Handoff Communication Policy was revised to reflect the above changes. The revised policy was distributed and reviewed with all ED physician and | | | |

✓

10

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| | nursing staff.<br><br>The Emergency Department completed implementation of Dragon Medical Voice Recognition (dictation) software in April 2013.  This will allow concurrent dictation by ED physicians with immediate recording of care information into the organization's electronic medical record.<br><br>MD #10 failed to follow the physician-to-physician MD Handoff Communication policy as written.  MD # 10 was placed on a Focused Professional Practice Evaluation (FPPE) effective December 2012, with formal notification to the Credentials Committee in January 2013. This FPPE will specifically address the failure of MD #10 to adhere to published ED policies. | | | |

11

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| | Emergency Department medical staff members were reviewed to determine whether any corrective action was warranted as to acts or omissions committed by such persons in connection with the care rendered to Patient #3 as part of Hospital and Medical Staff peer review and quality assurance/performance improvement (QAPI) activities.  MD # 10 has been placed on a Focused Professional Practice Evaluation (FPPE).  Records detailing any corrective actions taken are in the possession of the Hospital. | | | |
| 3.      *Based on review of facility documentation, manufacture's guidelines and interview, the facility failed to ensure that contracted services were provided in a safe manner.   The findings include: a.      Review of facility documentation related ti hemdialysis failed to identify that preventative maintenance of the portable | The Hospital responds as follows:  a and b:  The Hospital disagrees with the findings that it failed to ensure that the services | a and b:  The Nursing Director of Clinical Operations for Medicine and Surgery and Acute Renal Services LLC | a and b:  January 31, 2013 | a and b:  Acute Renal Services LLC will provide documentation of the testing, diagnostics, |

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| reverse osmosis (RO) machines had been completed in accordance with manufacturers guidelines.  Review of the maintenance log identified that the hemodialysis machines and RO was disinfected in July, August, and September of 2012.  Interview with the Dialysis staff sated the RO was not disinfected in October or November but completed in an as needed basis. Interview with facility staff in 11/28/12 identified that the portable RO's do not require preventative maintenance.<br>b.      Review of the manufactures guidelines for the WRO 95 re 04-2012 identified that the carbon/particle filter should be changed and the machine disinfected on a monthly basis,  Every six months reject water from the RO should be monitored fir hardness, chlorine, iron and temperature.  Every six months the RO drain flow and the pure water flow should be measured, conductivity checked and tubing and connectors checked. | provided by its contracted dialysis vendor were provided in a safe manner. The manufacturer guidelines referenced in the finding relate to recommended maintenance outlined in the Gambro WRO 95 Service Manual.  The contracted dialysis vendor performed maintenance specifically carbon/particle filter changes and machine disinfection according to the Gambro WRO 95 Operator's Manual.  In the Gambro WRO 95 Operator's Manual within the "Maintenance Section" (4:2 & 4:3).  The manufacturer states the following:<br><br>Changing the pre-filter cartridge: Frequency: Monthly or according to local standards.<br><br>Disinfection Frequency: Required frequency depends on several factors and no general rules can therefore be given.  The disinfection | | | checks and measurements necessary for safe operation of the ROs to the Nursing Director of Clinical Operations for Medicine and Surgery every month. |

13

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| | schedule should be based on the microbiological testing performed by the clinic.<br><br>All dialysis testing has been reported to Infection Disease Committee which reports to the Medical Executive Committee (MEC), the Medical Staff Governing Body.<br><br>Starting in January 2013, the Hospital's dialysis vendor, Acute Renal Services LLC, will document the filter changes and disinfection in a log maintained by them and will provide copies of the documents verifying necessary filter changes and disinfection, including microbiological testing, to the Nursing Director of Clinical Operations for Medicine and Surgery or designee on a monthly basis.<br><br>Acute Renal Services LLC will ensure that reject water from | | | |

14

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| | the RO will be monitored for hardness, chlorine, iron and temperature every six months independently or by a vendor contracted by them.<br><br>Acute Renal Services LLC will ensure that the RO drain flow and the pure water flow will be measured, conductivity checked and tubing and connectors checked every six months. | | | |
| The following are violations of the Regulations of Connecticut State Agencies Section 19-13-D3 (c) Medical staff (2)(B) and/or (d) Medical Records (3).<br><br>4.        Based on a review of the clinical record, staff interviews and a review of the facilities policies and procedures for one of three sampled patients (Patient #34), the facility failed to obtain a comprehensive physician's order for the use of oxygen in accordance with the hospital policy and/or failed to obtain a physician's order for continuous pulse oximeter monitoring. The | The Hospital responds as follows:<br><br>a and b<br><br>The Hospital reviewed the oxygen orders in Meditech electronic health record (EHR) system to ensure complete and accurate orders for use of oxygen can be entered. The oxygen orders include amount, delivery route, liter flow, O2 concentration and desired O2 | a and b<br><br>Clinical Chief of Pediatrics and Nursing Clinical Director of Maternal Child Health | a and b<br><br>February 28, 2013 | a and b:<br><br>The Nursing Clinical Director of Maternal Child Health will conduct ten (10) random medical record audits a month for three (3) consecutive months of patients with oxygen orders to ensure |

15

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| findings included:<br>a.      Patient #34 was admitted to the hospital on 11/27/12 with a diagnosis that included respiratory syncytial virus. Interview and review of the clinical record on 11/28/12 at 1:00 PM with MD #8 failed to identify the method of administration for oxygen, liter flow, and the amount of oxygen to be delivered to Patient #34. MD #8 indicated it was the responsibility of the physician to order oxygen therapy on admission that included the mode of administration, liter flow, and the amount of oxygen to be administered. Subsequent to the surveyor ' s inquiry an order was written for Patient #34 that directed oxygen delivery for pulse oximeter monitoring that was less than ninety percent via blow by at six liters per minute with oxygen administration at 100%. The hospital policy for oxygen therapy directed in part that orders for oxygen therapy would specify the method of administration, liter flow and amount of oxygen. Further review of the hospital policy directed oxygen therapy would be administered following a physician ' s order and documented in the patient ' s medical record.<br>b.      Tour of the pediatric unit on 11/28/12 | saturations.<br><br>The Hospital reviewed all established Neonatal and Pediatric order sets to ensure respiratory therapy orders include the method of administration for oxygen, liter flow, the amount of oxygen to be delivered, and  pulse oximetry orders in each order set. In addition the Hospital reviewed the Oxygen Therapy policy to ensure it includes the method of administration for oxygen, liter flow, the amount of oxygen to be delivered and pulse oximetry orders.<br><br>The current "Peds Supplemental O2 Titration" order will be removed from Meditech Order entry system and be replaced with more specific orders that include the method of administration for oxygen, liter flow, the amount of oxygen to be delivered and pulse oximetry orders | | | accuracy of respiratory orders.<br><br>The Nursing Clinical Director of Maternal Child Health will conduct ten (10) random medical record audits a month for three (3) consecutive months of patients with oxygen orders to ensure accuracy of pulse oximetry orders |

16

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| at 11:30 AM identified Patient #34 was monitored for oxygen levels via continuous pulse oximetry. Interview and review of the clinical record with MD #8 on 11/28/12 at 1:00 PM failed to identify an order was obtained for continuous pulse oximeter monitoring. Interview with Director #1 on 11/28/12 at 2:45 PM indicated an order should have been initiated on admission for continuous pulse oximeter monitoring that directed the use of oxygen to maintain oxygen saturations levels above ninety percent. Subsequent to the surveyor ' s inquiry an order for continuous pulse oximeter monitoring was initiated. The hospital failed to have a policy that directed the use and/or frequency of pulse oximeter monitoring. | The Hospital reviewed the respiratory therapy orders with IS to ensure the orders include the correct fields for delivery route, liter flow, O2 concentration, pulse oximeter orders and desired O2 saturations.<br><br>Re-education of physicians and nursing staff regarding the necessity of accurate respiratory orders and pulse oximetry orders occurred and physician and nursing hand-off will include review of patient orders for oxygen and pulse oximetry.<br><br>The Nursing Clinical Director of Maternal Child Health discussed respiratory oxygen orders and pulse oximetry orders with nursing staff at the January 2013 staff meeting.<br><br>The Clinical Chief of Pediatrics reviewed respiratory | | | |

17

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| | oxygen orders and pulse oximetry orders with the pediatricians in January 2013 at the Clinical Department meeting.<br><br>The Hospital disagrees with the findings that the Hospital failed to have a policy that directed the use and/or frequency of pulse oximeter monitoring. The Hospital has several policies including the Oxygen Therapy Policy that includes the indications for pulse oximeter in relation to oxygen therapy.<br><br>The Hospital added a section to the Administration of Oxygen and/Aerosol Therapy policy on the procedure for pediatric patients with O2 Blow-by and the use and frequency of pulse oximetry. | | | |
| The following are violations of the Regulations of Connecticut State Agencies Section 19-13-D3 (c) Medical staff (2)(B) | The Hospital responds as follows: | a, b, and c:<br><br>Clinical Chief of | a, b, and c:<br><br>February 28, 2013 | a, b, and c:<br><br>The Nursing |

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| and/or (d) Medical Records (3).<br><br>5.     Based on a review of the clinical record and staff interviews for three of three sampled patients (Patient #34, #36 and #40), the facility failed to prescribe dietary orders for the patient. The findings included:<br>a.     Tour of the pediatric unit on 11/28/12 at 11:30 AM identified Patient #36 was bottle feeding.  Interview and review of the clinical record with RN #6 indicated the diet order for Patient #36 was identified as regular. RN #6 indicated the orders were written as a regular diet so the parent of the patient would receive a meal. Interview with Director #1 on 11/28/12 at 2:50 PM identified the diet order should be the patient's order and not an order for the parent. Subsequent to the surveyors inquiry a physician's order was initiated for the use of formula.<br>b.     Interview and review of the clinical record with RN #6 on 11/28/12 at 11:40 AM identified Patient #34 was on a regular diet. Further interview with the RN #6 indicated Patient #34 was breast feeding and regular diet orders were written so the parent would receive a meal. Interview with Director #1 on 11/28/12 at 2:50 PM identified diet orders should be written that reflected the patient's | a, b, and c:<br><br>The Clinical Chief of Pediatrics and the Nursing Clinical Director of Maternal Child Health re-educated the pediatricians, hospitalists, nursing staff, and residents regarding requirement for timely and accurate dietary orders.<br><br>A memo was sent to all pediatricians, hospitalists and residents in January 2013. Pediatric Nursing staff was notified in December 2012 during daily unit huddles.<br><br>Discussion of appropriate documentation for diet orders was added to the Unit Staff Meeting and Pediatric Business Meeting agenda item for February 2013.<br><br>Nursing change of shift hand-off in the Pediatric unit will include reconciliation of | Pediatrics and Nursing Clinical Director of Maternal Child Health | | Clinical Director of Maternal Child Health will conduct ten (10) random medical record reviews a month for three (3) consecutive months and then ten (10) record reviews quarterly for one (1) year to ensure appropriate patient dietary orders.<br><br>The Nursing Clinical Director of Maternal Child Health will conduct ten (10) random medical record reviews a month for three (3) consecutive months and then ten (10) record reviews quarterly for one (1) year to |

19

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| diet. Subsequent to the surveyors inquiry breast feeding was ordered as the diet for Patient #34.<br>c.       Patient # 40 was a full term infant delivered on 11/26/12. Review of the clinical record with RN #8 on 11/28/12 at 10:30 AM identified physician ' s orders directed breast and bottle feeding. Interview with Nurse Manager #2 on 11/28/12 at 10:35 AM indicated infant feeding orders were routinely written as breast and bottle so the physician would not be disturbed in the middle of the night for a change in diet order. Interview with Director #1 on 11/28/12 at 2:45 PM identified physician orders should reflect one diet order and the physician should be notified if an order change is needed for a medical indication and/or a maternal request | patient dietary orders.<br><br>Education received by staff Physicians at hand-off to include review of patient dietary orders.<br><br>The Hospital believes the findings misquoted Nurse Manager #2  and the Chair of Pediatrics in saying that infant feeding orders were routinely written as breast and bottle as not to disturb the physician in the middle of the night. Pediatric hospitalists are available in the hospital 24 hours a day to provide orders for patients. The Chair of Pediatrics clarified with DPH surveyor that we support and encourage breastfeeding, and follow our breastfeeding policy for well infants.  When mothers are not breastfeeding, or should there be an indication for formula, our process is to follow parent preference. In the event that the parents do not | | | ensure that separate orders are written for breastfeeding and bottle feeding . |

20

✓

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| | have a preference, the pediatricians have a group choice that becomes the formula of choice for their patients. The MD referenced the order set, which was built so as not to have to place a call to the pediatrician to obtain a routine feeding order that is addressed in the order set and in our policy.  This is standard operating procedure in nurseries across the country. Stamford Hospital has no issue calling and communicating to physicians for any patient need, change in condition, etc. at any time of the day or night, and physicians are always receptive to our phone calls<br><br>The Clinical Chief of Pediatrics and the Nursing Clinical Director of Maternal Child Health re-educated the pediatricians, hospitalists, nursing staff, and residents regarding requirement for timely and accurate dietary | | | |

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| | orders, especially for documenting breast feeding or bottle feeding. . | | | |
| | A memo was sent to all pediatricians, hospitalists and residents, nursing was notified in unit huddles and diet orders specific to breastfeeding and bottle feeding was added to the Staff Meeting and Business Meeting agenda item for February. | | | |
| | Nursing change of shift hand-off will include reconciliation of patient dietary orders including Breast Feeding. | | | |
| | Education received by staff Physician hand-off to include review of patient orders including Breast Feeding. This has been done through a memo sent to all pediatricians, hospitalists and residents in January 2013. | | | |
| | Pediatric Nursing staff was | | | |

22

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| | orders, especially for documenting breast feeding or bottle feeding. . <br><br> A memo was sent to all pediatricians, hospitalists and residents, nursing was notified in unit huddles and diet orders specific to breastfeeding and bottle feeding was added to the Staff Meeting and Business Meeting agenda item for February. <br><br> Nursing change of shift hand-off will include reconciliation of patient dietary orders including Breast Feeding. <br><br> Education received by staff Physician hand-off to include review of patient orders including Breast Feeding. This has been done through a memo sent to all pediatricians, hospitalists and residents in January 2013. <br><br> Pediatric Nursing staff was | | | |

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| The following are violations of the Regulations of Connecticut State Agencies Section 19-13-D3 (d) Medical Records (3) and/or (e) Nursing staff (1).

7.       Based on review of the clinical record, interview and policy review the facility failed to ensure that pain assessments for one (Patient #19) were completed in accordance with hospital protocol and/or that one patient who required hemodialysis (#18) was weighed following treatment. The findings include the following:
a.       Patient #19 was admitted to the rehab unit on 11/25/12 after a laminectomy/fusion. Review of the clinical record indicated that on 11/26/12 at 8:00 AM the patient had a pain level of of 7 on a 1-10 scale (10 being the worst possible pain). The patient had a pain level of 7 at 10:24 AM and was treated with Oxy IR. A reassessment at 11:30 AM identified the patient rated pain as a 2. The clinical record indicated that the patient was next assessed nine and half hours later at 8:00 PM and was identified to have a pain level of 5 and assessed again at 11/27/12 at 8:00 AM for a pain level of 7.  Interview with staff identified that pain assessments should be completed every four hours and | The Hospital responds as follows:

a. The Rehab Nurse Manager will review the pain management and administration policy with the Rehab nursing staff. | a. Nursing Director of Clinical Operations for Rehab | a. January  31, 2013 | a. The Rehab Nurse Manager will conduct ten (10) random charts audits for three (3) consecutive months and then ten (10) random charts audits quarterly for one (1) year to ensure compliance and adherence to pain management policy. |

24

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| | orders, especially for documenting breast feeding or bottle feeding. . <br><br> A memo was sent to all pediatricians, hospitalists and residents, nursing was notified in unit huddles and diet orders specific to breastfeeding and bottle feeding was added to the Staff Meeting and Business Meeting agenda item for February. <br><br> Nursing change of shift hand-off will include reconciliation of patient dietary orders including Breast Feeding. <br><br> Education received by staff Physician hand-off to include review of patient orders including Breast Feeding. This has been done through a memo sent to all pediatricians, hospitalists and residents in January 2013. <br><br> Pediatric Nursing staff was | | | |

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| | notified in December 2012 during daily unit huddles. | | | |
| The following are violations of the Regulations of Connecticut State Agencies Section 19-13-D3 (c) Medical staff (2)(B) and/or (d) Medical Records (3) and/or (e) Nursing staff (1). <br><br> 6.      Based on medical record reviews and interviews for one of three patients reviewed for intravenous (IV) therapy administration (Patient #26), nursing staff failed to follow the physician's IV order. The finding includes: <br> a.      Patient #26 had upper and lower endoscopic procedures performed on 11/27/12. Physician orders dated 11/27/12 directed an IV of Lactated Ringers solution at 125 cc/hour. Review of nursing documentation with the Nurse Manager on 11/27/12 at approximately 10:30 AM noted that although the correct IV had been started by the nurse on 11/27/12 at 8:09 AM, the IV had infused at a rate of 100 cc/hour preoperatively and postoperatively instead of the rate of 125 cc/hour as ordered. | The Hospital responds as follows: <br> The patient's nurse confirmed that the patient was receiving the correct IV infusion rate of 125cc/hour but the nurse entered the rate of 100cc/hour into the computerized documentation system. The nurse was verbally counseled on the importance of correct documentation. | Nurse Manager of Endoscopy. | January 31, 2013 | The Nurse Manager of Endoscopy will audit ten (10) medical records a month for three months, then ten (10) medical records a quarter for one year to ensure the physician order matches the nursing documentation for IV fluids and rate. |

23

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| that the order in the computer had not been updated.<br>b.        Review of Patient #18's clinical record indicated that the patient was receiving hemodialysis. The patient was admitted with fluid overload. Review of the flow sheets dated 11/23/12, 11/24/12 and 11/25/12 failed to identify that the patient had been weighed after the dialysis treatment.  Interview with staff on 11/28/12 identified that weights are not completed after dialysis unless ordered by the physicians and that the physicians calculate fluid removed. Interview with the Director of Risk on 12/7/12 at 10:00 AM indicated that there is no policy for hemodialysis assessments. Interview with the Attending physician on 12/13/12 at 11:15 AM identified that patients should be weighed after each hemodialysis treatment. | b. The Hospital  in coordination with Acute Renal Services LLC will implement the following:<br><br>A policy was developed and instituted requiring weights on all patients following each hemodialysis treatment.<br><br>Physician and Nursing Staff members will be educated on this practice requirement. Acute Renal Services LLC staff and Hospital clinical staff members will collaborate to ensure that weights are obtained on patients following each treatment.  Acute Renal Services LLC staff will document the pre, target and post dialysis weight on the Acute Renal Services LLC Hemodialysis Flowsheet. | b. Nursing Clinical Director of Medicine and Surgery and Acute Renal Services LLC staff | b. January  31, 2013 | b. Compliance will be audited through random medical record review of hemodialysis patients.  The review will be conducted by the Nurse Manager of Main 3 South. The audit will consist of five (5) charts per month for three (3) consecutive 3 months |
| The following is a violation of the Regulations of Connecticut State Agencies | The Hospital responds as follows: | Director of Pharmacy, Director of Material | January 31, 2013 | The Director of Materials |

25

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| Section 19-13-D3 (g) Pharmacy (6). <br><br> 8.      Based on observation, review of hospital policy and interview with hospital personnel regarding medication room access, documentation and interviews failed to reflect that the medication supply room and storage was secure.  The findings include: <br> a.      During tour of the telemetry unit on 11/26/12 at 11:10 AM,  a central supply medical technician was observed stocking supplies in the medication room without a licensed nurse present.  Interviews with the charge nurse, RN #1, and the Risk Manager at the time of the observation identified that a licensed nurse must be present when the technician was in the medication room. | An immediate corrective action plan was instituted: <br> •      The Director of Materials Management has reviewed with Distribution Supply Clerks the policy for entering the medication room. This was done during the weekly morning "huddles" <br> •      The Director of Materials Management has also communicated the policy requirement to Material Management supervisors on a daily basis so that they in turn remind material management staff of this policy. <br> •      The Material Management staff has been instructed that without authorized supervision, they are to bring supplies back to the Materials Management Distribution Center, and call and e-mail the Nursing Unit in question, to inform them that they will need to return for supply delivery and coordinate supervision for medication | Management and the Nursing Clinical Director of Medicine and Surgery. | | Management will randomly audit the Material Management staff through unannounced visits to medication rooms during deliveries to ensure compliance with Hospital policy. Five random visits will be conducted per month for three (3) consecutive months then quarterly for one (1) year. |

26

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| | room access as an immediate temporary process.<br><br>The Hospital policy for who can access the medication room was reviewed and revised in April 2013.<br><br>Staff allowed to access the med rooms were educated on med room access and the revised policy. | | . | |
| The following are violations of the Regulations of Connecticut State Agencies Section 19-13-D3 (d) Medical Records (3) and/or (e) Nursing staff (1) and/or (i) General (6).<br><br>9.      Based on a review of the clinical record, staff interviews and a review of the facilities policies and procedures for one patient (Patient #40), the facility failed to document intake and/or failed to identify the location of the infant. The findings included:<br>a.      Patient # 40 was a full term infant delivered on 11/26/12. Review of the clinical record with RN #8 on 11/28/12 at 10:30 AM identified physician's orders directed breast and bottle feeding. Interview and review of | The Hospital responds as follows:<br>A follow-up interview with RNs caring for the patient confirmed that the nurse was aware that the baby was breastfeeding throughout the night and that the baby was breastfeeding between eight and twelve times a day.  This information was also corroborated by the mother upon interview with the DPH surveyor.<br><br>The Hospital reviewed Physician orders for directed | The Nursing Clinical Director of Maternal Child Health | December 31, 2012 | The Maternal Child Health Educator will conduct ten (10) random charts audits for three (3) consecutive months to ensure compliance and adherence to Breast feeding documentation.<br><br>The Maternal Child Health Educator will conduct ten (10) |

27

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| the clinical record on 11/28/12 at 10:35 AM with RN #8 failed to identify feedings were provided and/or documented on 11/27/12 from 7:45 PM through 11/28/12 at 9:45 AM. Further interview and review of the clinical record with RN #8 indicated the infant had six feedings in twenty four hours. Interview with the lactation consultant on 11/28/12 at 12:50 PM identified normal breast feeding frequency is eight to twelve times in a twenty four hour period. The hospital policy for breast feeding indicated frequent feeding would assist in the development of a full milk supply. Interview and review of the clinical record with RN #8 on 11/28/12 at 10:40 AM indicated the location of the infant was only identified at the time of the neonatal assessment and did not discern if the mother infant dyad were together or if the infant was in the nursery. Interview with Director #1 on 11/28/12 at 3:00 PM indicated the location of the infant should be identified in the clinical record at all times and was not. The hospital policy for breastfeeding directed in part that mothers would be encouraged to stay together whenever possible to facilitate frequent feedings at the breast. The policy further identified that rooming in would | breast and bottle feeding and changed to a more descriptive order in January 2013. The current orders are based on patient directed breast feeding which gives the patient the choice of breast or bottle. The orders will be separated with specific orders for bottle feeding.<br><br>The nursing educator will re-educate all the maternity nursing staff regarding need for timely and accurate infant feedings documentation and communication of feedings to the oncoming nurses.<br><br>A memo was sent in January 2013 to all maternity nursing staff regarding breast and bottle feeding orders and documentation of feedings and was added to the Staff Meeting agenda item for February 2013.<br><br>Nursing change of shift hand-off reports will include review | | | random charts audits for three (3) consecutive months to ensure compliance and adherence to baby location documentation. |

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| assist parents in the identification of feeding cues. | of infant feedings.<br><br>The location of the infant is documented in the electronic medical record at the time of the neonatal assessment and the RN caring for the mother/infant dyad is aware of the infants location at all times. The RN's, per policy, encourage rooming-in at all times to facilitate frequent feedings at the breast and accommodate the preferences of the patients.<br><br>Director #1 was misquoted in the interview on 11/28/12 at 3:00 PM as stating that the "location of the infant should be identified in the clinical record at all times and was not". Director #1 stated that the change in documentation would be considered upon suggestion by the DPH surveyor. Stamford Hospital added baby location to nursing documentation after further | | | |

29

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| | internal discussion. | | | |
| The following are violations of the Regulations of Connecticut State Agencies Section 19-13-D3 (d) Medical Records (3) and/or (e) Nursing staff (1) and/or (i) General (6).<br><br>10.      Based on a review of the clinical record, policy review and interviews, the facility failed to ensure that a comprehensive care plan was completed for one patient (Patient #18).  The finding includes the following:<br>a.      Review of Patient #18's clinical record indicated that the patient was admitted with fluid overload and required hemodialysis.  Interview with the RN on 11/27/12 indicated that the patient had a fistula placed in 2011 but was very nervous and hesitant to start hemodialysis.  The patient was started on a renal diet.  Review of the clinical record on 11/27/12 with the Manager and staff identified that the patient had a nutrition consult completed by dietary on 11/27/12 that identified that the patient had no nutritional needs at this time.  Review of the care plan identified that the patients active problems included Infection, | The Hospital responds as follows:<br><br>The Hospital's current care planning process is as follows: The plan is developed and individualized with the involvement of patient/family/significant other, focusing on the patient goals and measurable outcomes. Care and treatment are planned to ensure that they are prioritized including co-morbidities according to patient's needs and severity of disease, condition, impairment or disability<br><br>The Hospital disagrees that the plan of care developed for Patient #18 was not individualized and comprehensive.   The Nursing Clinical Director of Medicine and Surgery reviewed patient #18's medical record. The plan | The Nursing Clinical Director of Medicine and Surgery | May 31, 2013 | The Nursing Clinical Director of Medicine and Surgery will review the CMS findings and the Care Plan policy with the unit staff by June 30, 2013. |

RECEIVED
JUN 21 2013
FACILITY LICENSING & INVESTIGATIONS SECTION
DEPT. OF PUBLIC HEALTH

30

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| knowledge deficit and alteration in renal perfusion related to hypovolemia. The care plan failed to address the patient's potential nutrition issues and/or fluid overload status.<br><br>Review of the policy indicated that the care plan should be individualized and serves as a guide for defining care and promoting discharge planning. | of care specifically addressed the patient's potential nutritional issues and the patient's fluid overload status as evidenced by the documentation contained within the electronic medical record. The plan of care initiated on admission and followed through to discharge included specific assessments and interventions related to hypervolemia, nutritional teaching, infection, and integration of teachings into daily life. The patient had nutritional and dietary assessments, teaching and interventions that were documented on twice daily within the plan of care, the education record and in the narrative nurse's note dated 11/25/12. The patient was also seen and evaluated by a registered dietician on 11/27/12. The plan of care reflected the patient's | | | |

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| | individual needs related to the ineffective retention of past education regarding which had been documented in the physician's History and Physical. The plan of care served as a guide for defining the patient's care and promoting the discharge plan for the patient. | | | |
| The following are violations of the Regulations of Connecticut State Agencies Section 19-13-D3 (c) Medical staff (2)(B) and/or (e) Nursing staff (1).<br><br>11.      Based on medical record reviews and interviews for one of three patients reviewed for intravenous (IV) therapy administration (Patient #25), the record lacked a physician's order for IV administration. The finding includes:<br>a.      Patient #25 had upper and lower endoscopic procedures performed on 11/27/12. Nursing documentation indicated that an IV of Lactated Ringers was started by the nurse at 7:18 AM in the left arm. Review of the patient's record with the Nurse Manager on 11/27/12 at approximately 10:30 | The Hospital responds as follows:<br>Each Endoscopy patient will have IV orders that include: insertion, fluid type and amount and rate written by the admitting physician prior to the procedure. The written order is faxed to the pharmacy and entered into the medication database for patient (The Profile) by the pharmacist. | The Nurse Manager of Endoscopy | January  31, 2013 | The Nurse Manager reviewed the above process at the November 2012 staff meeting with all the nurses in endoscopy and preop and provided education on the need for physician orders.<br><br>The Nurse Manager of Endoscopy will audit ten (10) medical records a |

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implemen | Measurement Strategy |
|---|---|---|---|---|
| AM noted that an IV order had not been written or entered into the computer by the physician to direct the administration of the IV. Interview with the Nurse Manager at this time noted that the Anesthesiologist was responsible for IV orders unless the Anesthesiologist started the IV. | | | | month for three (3) consecutive months, then ten (10) medical records per quarter for one year to ensure the physician orders are documented for the IV. |
| The following are violations of the Regulations of Connecticut State Agencies Section 19-13-D3 (b) Administration (2) and/or (c) Medical staff (2)(B) and/or (g) Pharmacy (4) and/or (i) General (6).<br><br>12.      *Based on medical record reviews, review of facility documentation, and interviews for one of three patients reviewed for anticoagulation therapy (Patient #1), the pharmacist failed to ensure safe medication administration. The finding includes:<br>a.      Patient #1 had a history of atrial fibrillation (A-fib) was on Warfarin therapy and admitted to the hospital with sustained rapid ventricular rate (RVR) on 9/9/12. The physician's order dated 9/12/12 by MD #2 (3rd year Resident) directed Heparin | The Hospital responds as follows:<br>This case was reviewed by the Director of Pharmacy at the September 2012 pharmacy staff meeting. The Director of the Pharmacy discussed anticoagulation bridge therapy bleed prevention actions, the co-administration of anticoagulants and the importance of reviewing all comments placed by the prescriber on medications that require a justification on the computerized physician order entry (CPOE) system.<br>The pharmacy has added an | The Director of Pharmacy | January 31, 2013 | Pharmacy staff will conduct daily monitoring of warfarin therapy patients and will include review of the patient's profile (medication history) for any other anticoagulant orders used as a bridge for duplication. The results of monitoring will be reported to |

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| (anticoagulant) 5,000 units every eight hours SQ as prophylactic therapy to prevent thrombus formation (blood clot). Therapeutic Lovenox (anticoagulant) 90 mg every 12 hours SQ was ordered by MD #2 and approved by the pharmacist, MD #3, on 9/10/12. Blood work dated 9/10/12 indicated an International Normalized Ratio (INR-(clotting time)) of 2.5 (normal for A-fib = 2-3). Blood work dated 9/11/12 and 9/12/12 indicated that the Patient's INR was high at 3.2 and 3.4 respectively. Although the patient's Heparin was held at 10:00 PM on 9/12/12 and at 6:00 AM on 9/13/12 and was subsequently discontinued on 9/13/12, the Patient had a change in condition on 9/14/12 at 4:55 AM and was diagnosed with an acute left thalamic (brain) hemorrhage. Interview with the Director of Pharmacy, MD #4, on 11/28/12 at 1:30 PM identified that before a medication can be dispensed, the medication order must be approved by a pharmacist. MD #4 indicated that when a physician orders a duplicate therapy medication, the physician must enter a reason for the duplicate therapy. MD #4 noted that although the ordering physician entered that the patient was being monitored as the reason for the duplicate therapy, MD #3 should have questioned | INR level in the CPOE system so that whenever Lovenox is ordered, the current INR level will pop-up to inform the physician/pharmacist of the current INR. PT/INR/PTT is already added to Coumadin. This will enable the physician/pharmacist to be better informed when making decisions regarding Lovenox therapy. All overrides of pop-ups on the CPOE system signaling duplicate anticoagulant therapy will be followed-up by the pharmacist with a phone call to the ordering MD to discuss the order. The organization will evaluate a Physician Desktop feature which can be added to the Meditech medication ordering system. This allows pharmacy staff and physicians to send secure messages to each other regarding medication issues and is available with the upgrade to the Meditech | | | Pharmacy and Therapeutic Committee monthly. |

34

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| further and called the ordering physician. The hospital pharmacy job description identified that a critical responsibility of the pharmacist was to ensure appropriateness of therapy and dose for all patient populations. The hospital provided staff education and revision of the computerized ordering system for the most current INR to automatically show on the computer screen when Lovenox is ordered (already in place for Heparin/Coumadin ordering). | medication ordering system in 2013. Clinical leadership at the Hospital is reviewing the necessity of providing a "pop up" in the CPOE system suggesting that the prescriber of Amiodarone order a baseline INR with initiation of this medication. | | | |
| The following are violations of the Regulations of Connecticut State Agencies Section 19-13-D3 (a) Physical plant (1)(2)(4) and/or (b) Administration (2) and/or (i) General (6).<br><br>13.     Based on observation on 11/26/12 during a tour of the third floor (seventeen patients), Whittingham/Special Care Pavilion, Maternity and Women's Health Unit from 10:25 AM till 11:30 AM the surveyor accompanied by Director Safety and Security Department and the Executive Director of Facilities Management observed the following:<br>a.     The means of egress on the patient occupied third floor (seventeen patients), | The Hospital responds as follows:<br><br>a, b, and c:<br><br>An immediate corrective action plan was developed on the day of the survey, including a policy covering future occurrences of this type.  The policy: *Filming of Motion Pictures, Television Shows and Other Related Projects* ensures an appropriate level of safety and security for filming projects conducted by outside entities.  All filming activities | a, b, and c:<br><br>The Director of Safety and Security | a, b, and c:<br><br>February 28, 2013 | a, b, and c:<br><br>The Director of Safety and Security will ensure that all filming in the organization follows the policy: *Filming of Motion Pictures, Television Shows and Other Related Projects.* The policy will be posted for Stamford Hospital |

35

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| Whittingham/Special Care Pavilion, Maternity and Women's Health Unit were not maintained free of all obstructions or impediments to full instant use in the case of fire or other emergency; i.e., production equipment and furniture for the filming of a TV show was in use and/or stored in exit corridors of the unit.<br>b.      Door closers were not provided on the doors to the patient care rooms on the patient occupied third floor (seventeen patients), Whittingham/Special Care Pavilion, Maternity and Women's Health Unit that were be utilized as storage rooms by a production company for the filming of a TV show in order to maintain the required smoke resistance assembly in an opening to a hazardous area.<br>c.      The smoke barrier doors in the Maternity and Women's Health Unit were obstructed from closing by production equipment, belonging to a production company for the filming of a TV show that did not allow the doors to automatically close when released from the magnetic hold open devices. | conducted by outside entities will be evaluated for risk prior to entering into any agreement. Prior to approval of any filming project, a risk assessment, including any risk mitigation activities, will be reviewed and approved  by an Administrative Sponsor from the senior leadership team, the Hospital Safety Officer, the Administrative Director of Facilities Management, a Marketing representative, the Manager of Infection Control and Prevention and the Director of the unit or area identified for use.  The Director of Safety and Security will ensure proper adherence with all safety and security related to the policy.<br><br>Relevant provisions of the policy require that film crew members complete the contractor education packet prior to working on hospital property and that the Patient | | | leadership to review and sign-off in the education system, HealthStream. |

36

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| Whittingham/Special Care Pavilion, Maternity and Women's Health Unit were not maintained free of all obstructions or impediments to full instant use in the case of fire or other emergency; i.e., production equipment and furniture for the filming of a TV show was in use and/or stored in exit corridors of the unit. <br> b.        Door closers were not provided on the doors to the patient care rooms on the patient occupied third floor (seventeen patients), Whittingham/Special Care Pavilion, Maternity and Women's Health Unit that were be utilized as storage rooms by a production company for the filming of a TV show in order to maintain the required smoke resistance assembly in an opening to a hazardous area. <br> c.        The smoke barrier doors in the Maternity and Women's Health Unit were obstructed from closing by production equipment, belonging to a production company for the filming of a TV show that did not allow the doors to automatically close when released from the magnetic hold open devices. | conducted by outside entities will be evaluated for risk prior to entering into any agreement. Prior to approval of any filming project, a risk assessment, including any risk mitigation activities, will be reviewed and approved  by an Administrative Sponsor from the senior leadership team, the Hospital Safety Officer, the Administrative Director of Facilities Management, a Marketing representative, the Manager of Infection Control and Prevention and the Director of the unit or area identified for use.  The Director of Safety and Security will ensure proper adherence with all safety and security related to the policy. <br><br> Relevant provisions of the policy require that film crew members complete the contractor education packet prior to working on hospital property and that the Patient | | | leadership to review and sign-off in the education system, HealthStream. |

36

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| Whittingham/Special Care Pavilion, Maternity and Women's Health Unit were not maintained free of all obstructions or impediments to full instant use in the case of fire or other emergency; i.e., production equipment and furniture for the filming of a TV show was in use and/or stored in exit corridors of the unit.<br>b.      Door closers were not provided on the doors to the patient care rooms on the patient occupied third floor (seventeen patients), Whittingham/Special Care Pavilion, Maternity and Women's Health Unit that were be utilized as storage rooms by a production company for the filming of a TV show in order to maintain the required smoke resistance assembly in an opening to a hazardous area.<br>c.      The smoke barrier doors in the Maternity and Women's Health Unit were obstructed from closing by production equipment, belonging to a production company for the filming of a TV show that did not allow the doors to automatically close when released from the magnetic hold open devices. | conducted by outside entities will be evaluated for risk prior to entering into any agreement. Prior to approval of any filming project, a risk assessment, including any risk mitigation activities, will be reviewed and approved  by an Administrative Sponsor from the senior leadership team, the Hospital Safety Officer, the Administrative Director of Facilities Management, a Marketing representative, the Manager of Infection Control and Prevention and the Director of the unit or area identified for use.  The Director of Safety and Security will ensure proper adherence with all safety and security related to the policy.<br><br>Relevant provisions of the policy require that film crew members complete the contractor education packet prior to working on hospital property and that the Patient | | | leadership to review and sign-off in the education system, HealthStream. |

36

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| | Care Director of the area involved appropriately communicate with patients in advance of the event to ensure patient rights and security are maintained.  Additionally, affected staff and the film crew will be inserviced in relation to applicable environmental safety issues, and a clinical staff member will be assigned as the liaison between the Hospital and the film crew in relations to these activities. A file for each project will be maintained by the Director of Safety & Security documenting the risk identification and mitigation steps taken.<br><br>Finally, the policy will ensure compliance with NFPA 101-2000 including proper access, egress, separation of occupancies and hazard location protection.  The policy will also ensure that (i) a Security Officer is posted on the affected unit to ensure | | | |

37

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| | security; and (ii) two engineering staff members are placed on the affected unit to maintain a fire watch. The Security and Engineering staff will ensure that means of egress are continuously maintained free of all obstructions or impediments to full instant use in the case of fire or other emergency; i.e., production equipment and furniture related to the filming are not in use and/or stored in exit corridors of the unit. The Security and Engineering staff will ensure that the smoke barrier doors on the unit/department are not obstructed from closing by production equipment connected with a filming project and that doors to affected units automatically close when released from the magnetic hold open devices. The Security and Engineering staff will ensure that any storage areas used by the film | | | |

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| | security; and (ii) two engineering staff members are placed on the affected unit to maintain a fire watch. The Security and Engineering staff will ensure that means of egress are continuously maintained free of all obstructions or impediments to full instant use in the case of fire or other emergency; i.e., production equipment and furniture related to the filming are not in use and/or stored in exit corridors of the unit. The Security and Engineering staff will ensure that the smoke barrier doors on the unit/department are not obstructed from closing by production equipment connected with a filming project and that doors to affected units automatically close when released from the magnetic hold open devices. The Security and Engineering staff will ensure that any storage areas used by the film | | | |

38

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| | security; and (ii) two engineering staff members are placed on the affected unit to maintain a fire watch. The Security and Engineering staff will ensure that means of egress are continuously maintained free of all obstructions or impediments to full instant use in the case of fire or other emergency; i.e., production equipment and furniture related to the filming are not in use and/or stored in exit corridors of the unit. The Security and Engineering staff will ensure that the smoke barrier doors on the unit/department are not obstructed from closing by production equipment connected with a filming project and that doors to affected units automatically close when released from the magnetic hold open devices. The Security and Engineering staff will ensure that any storage areas used by the film | | | |

38

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| | production company in patient care areas maintain the required smoke resistance assembly required in an opening to a hazardous area | | | |
| The following are violations of the Regulations of Connecticut State Agencies Section 19-13-D3 (a) Physical plant (1)(2)(4) and/or (b) Administration (2) and/or (i) General (6). <br><br> 14.     Based on document review on 11/26/12 at 12:30 PM, the Director Safety and Security Department and the Executive Director of Facilities Management did not provide the surveyors with documentation to indicate that electrical equipment used by a production company for the filming of a TV show on the patient occupied third floor (seventeen patients), Whittingham/Special Care Pavilion, Maternity and Women's Health Unit were inspected as required in NFPA 99, Section 7-5.1.3., 7-5.2.2.1 and 7-6.2.1.2 and as part of the facilities preventive maintenance program; i.e., inspection and/or testing for physical integrity, resistance, leakage current tests and chassis leakage current was not conducted and recorded by | The Hospital responds as follows: <br> An immediate corrective action plan was developed on the day of the survey, including a policy covering future occurrences of this type.  The policy: *Filming of Motion Pictures, Television Shows and Other Related Projects* ensures an appropriate level of safety and security for filming projects conducted by outside entities.  All filming activities conducted by outside entities will be evaluated for risk prior to entering into any agreement.  Prior to approval of any filming project, a risk assessment, including any risk mitigation activities, will be reviewed and approved  by an Administrative Sponsor from | The Director of Safety and Security | February 28, 2013 | The Director of Safety and Security will ensure that all filming in the organization follows the policy: *Filming of Motion Pictures, Television Shows and Other Related Projects.* The policy will be posted for Stamford Hospital leadership to review and sign-off in the education system, HealthStream. |

39

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| the facility before the equipment was put into service by the production company. | the senior leadership team, the Hospital Safety Officer, the Administrative Director of Facilities Management, a Marketing representative, the Manager of Infection Control and Prevention and the Director of the unit or area identified for use.  The Director of Safety and Security will ensure proper adherence with all safety and security related to the policy.  The policy will ensure compliance with NFPA 101-2000 including proper access, egress, separation of occupancies and hazard location protection.  The policy will also ensure that (i) a Security Officer is posted on the affected unit to ensure security; and (ii) two engineering staff members are placed on the affected unit to maintain a fire watch. The Security and Engineering staff will ensure that means of | | | |

40

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| | egress are continuously maintained free of all obstructions or impediments to full instant use in the case of fire or other emergency; i.e., production equipment and furniture related to the filming are not in use and/or stored in exit corridors of the unit. The Security and Engineering staff will ensure that the smoke barrier doors on the unit/department are not obstructed from closing by production equipment connected with a filming project and that doors to affected units automatically close when released from the magnetic hold open devices. The Security and Engineering staff will ensure that any storage areas used by the film production company in patient care areas maintain the required smoke resistance assembly required in an opening to a hazardous area Relevant provisions of the | | | |

41

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| | policy require that film crew members complete the contractor education packet prior to working on hospital property and that the Patient Care Director of the area involved appropriately communicate with patients in advance of the event to ensure patient rights and security are maintained.  Additionally, affected staff and the film crew will be inserviced in relation to applicable environmental safety issues, and a clinical staff member will be assigned as the liaison between the Hospital and the film crew in relations to these activities. A file for each project will be maintained by the Director of Safety & Security documenting the risk identification and mitigation steps taken. | | | |

42

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| The following are violations of the Regulations of Connecticut State Agencies Section 19-13-D3 (b) Administration (2) and/or (c) Medical staff (2)(B) and/or (e) Nursing service (1) and/or (i) General (6).

15.    Based on a tour of the operative suite, review of hospital policies, observations and interviews, the hospital failed to ensure proper donning of surgical attire and/or that opened multi-dose vials were dated and/or that endoscopes were dried/stored in a sanitary manner. The finding includes:
a.      A tour of operating room (OR) #1 was conducted with the Director of the OR on 11/26/12 at 10:24 AM. Observation on 11/26/12 at 10:24 AM noted the Circulating Nurse leaning over or standing next to the sterile field while performing the initial count procedure with his/her hair exposed at the back and sides of the bouffant hair covering. Subsequent to surveyor inquiry and management staff intervention, the Circulating Nurse's hair was placed beneath the bouffant and hair was no longer exposed. The hospital policy for surgical attire identified that the surgical head covering should be clean, low lint and confine all hair and scalp skin. | The Hospital responds as follows:

a. All staff in Operating Room (OR) has been inserviced on proper attire in the surgical suite which includes hair covering and was given a read and sign sheet for review of the OR Attire Policy in December 2012. | a. The Nursing Director of Perioperative Services | a. December 31, 2012 | a. The Nursing Director of Perioperative Services will conduct random observations of OR head gear ten (10) times a month for three (3) consecutive and then quarterly for one year. |

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| b.      A tour of the OR was conducted with the Director of the OR on 11/26/12 at 10:24 AM. Observation of one of two anesthesia carts noted that one anesthesia cart contained four vials of Succinylcholine and one vial was opened. Although the vial was dated with the 30 day expiration date from the time the vial was removed from refrigeration, the date that the vial was opened was written on the vial with black marker, was smudged and unreadable. Interview with the Anesthesiologist on 11/26/12 at 10:30 AM indicated that s/he utilized the anesthesia cart for a prior case and did not notice the opened vial of Succinylcholine or s/he would have discarded the vial. The multi-dose vial policy identified that multi-dose vials are to be labeled to expire 28 days after the initial entry. | b. All medications will be stored in the Pyxis machine and not stored in the anesthesia carts. The Anesthesia Tech restocks the anesthesia cart and will ensure that there are no medications on the cart. The pharmacy restocks the pyxis machine daily and will monitor and discard any opened or expired medication and per current policy. | b. Clinical Chief of Anesthesia and Director of Pharmacy | b. December 31, 2012 | b. The pharmacist staff will check the anesthesia checks weekly during their regular rounds to ensure no medications are kept in the anesthesia carts. |
| c.      A tour of the hospital central sterile department was conducted on 11/26/12 at 11:50 AM. Observation on 11/26/12 at 11:50 AM noted that the tips of 2 of 3 processed endoscopes rested on the moist drip cloth beneath the scopes in the scope cabinet. The observation also indicated that due to the shortness of the storage cabinet, the scopes could not be fully extended during the drying process. Subsequently, the 2 scopes were | c. Central Process Department (CPD) staff has been inserviced on proper storage of scopes in the storage cabinet, foam guards have been placed on the ends of the scopes preventing the guards from touching the bottom of the cabinet | c. Manager of Central Processing | c. December 31, 2012 | c. The Manager of Central Processing will monitor the scope cabinet three times a day for three (3) consecutive months to ensure that the scopes are |

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| looped differently by the CSD worker so that the tips of the scopes no longer touched the drip cloth. Review of the hospital policy for endoscopic cleaning and processing lacked direction for endoscope drying and storage. According to the Society of Gastroenterology Nurses, Inc., Standards of Infection Control in Reprocessing of Flexible Gastrointestinal Endoscopes Copyright © 2008, Hang the endoscope vertically with the distal tip hanging freely in a well-ventilated, dust-free area. A storage area with good ventilation will encourage continued air drying of the surfaces, and prevent undue moisture build-up, thus discouraging any microbial contamination. | | | | not touching the bottom of the cabinet |
| The following are violations of the Regulations of Connecticut State Agencies Section 19-13-D3 (b) Administration (2) and/or (l) Infection control (1)(A). <br><br> 16.     Based on tour and interview the facility failed to ensue that the infection control staff were included in a project that would be completed on the maternity unit | The Hospital responds as follows: An immediate corrective action plan was developed on the day of the survey, including a policy covering future occurrences of this type.  The policy: *Filming of Motion Pictures, Television Shows and* | The Director of Safety and Security | February 28, 2013 | The Director of Safety and Security will ensure that all filming in the organization follows the policy: *Filming of Motion Pictures,* |

45

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| with the use of contracted staff.   The finding includes the following:<br>a.        Tour of the postpartum maternity unit (census of 17 patients inclusive of mothers and newborns) on 11/26/12 at 10:30 am identified approximately 30-35 production company staff filming of a TV show.  The production company had equipment spread throughout the unit for filming purposes. Interview with the Manager on 11/26/12 at 11:00 AM identified that the hospital's Infection Prevention staff were not consulted in preparation for this event.<br>Interview with the Infection Prevention staff on 11/29/12 identified that they were not aware that filming was being completed in the hospital and that they should have been notified prior to the event.  The Hospital provided the Department with an immediate action plan dated 11/26/12 that identified key departments were not included in the walk through or approval process and subsequently developed to manage this approval process.<br><br>Review of the policy, "Medical Requirement Guidelines for Temporary Personnel," identified that temporary non-clinicians include contractors or employees of other | *Other Related Projects* ensures an appropriate level of safety and security for filming projects conducted by outside entities.  All filming activities conducted by outside entities will be evaluated for risk prior to entering into any agreement. Prior to approval of any filming project, a risk assessment, including any risk mitigation activities, will be reviewed and approved  by an Administrative Sponsor from the senior leadership team, the Hospital Safety Officer, the Administrative Director of Facilities Management, a Marketing representative, the Manager of Infection Control and Prevention and the Director of the unit or area identified for use.  The Director of Safety and Security will ensure proper adherence with all safety and security related to the policy.<br><br>Relevant provisions of the | | | *Television Shows and Other Related Projects.*<br>The policy will be posted for Stamford Hospital leadership to review and sign-off in the education system, HealthStream. |

✓

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| companies who do not have patient contact or clinical responsibilities. For personnel in a patient treatment area, personnel are required to provide PPD/TB surveillance requirements, including proof of measles, mumps, rubella, and varicella. | policy require that film crew members complete the contractor education packet prior to working on hospital property and that the Patient Care Director of the area involved appropriately communicate with patients in advance of the event to ensure patient rights and security are maintained. Additionally, affected staff and the film crew will be inserviced in relation to applicable environmental safety issues, and a clinical staff member will be assigned as the liaison between the Hospital and the film crew in relations to these activities. A file for each project will be maintained by the Director of Safety & Security documenting the risk identification and mitigation steps taken.<br><br>Finally, the policy will ensure compliance with NFPA 101-2000 including proper access, egress, separation of | | | |

47

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| | occupancies and hazard location protection.  The policy will also ensure that (i) a Security Officer is posted on the affected unit to ensure security; and (ii) two engineering staff members are placed on the affected unit to maintain a fire watch. The Security and Engineering staff will ensure that means of egress are continuously maintained free of all obstructions or impediments to full instant use in the case of fire or other emergency; i.e., production equipment and furniture related to the filming are not in use and/or stored in exit corridors of the unit. The Security and Engineering staff will ensure that the smoke barrier doors on the unit/department are not obstructed from closing by production equipment connected with a filming project and that doors to affected units automatically | | | |

48

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| | close when released from the magnetic hold open devices. The Security and Engineering staff will ensure that any storage areas used by the film production company in patient care areas maintain the required smoke resistance assembly required in an opening to a hazardous area | | | |
| The following is a violation of the Regulations of Connecticut State Agencies <u>Section 19-13-D3 (i) General (6).</u><br><br>17.     Based on medical record reviews, review of hospital policies and interviews for two of three patients (Patients #28, #29), radiology staff failed to perform a pregnancy screen prior to radiological testing. The finding includes:<br>a.     Patients #28 and #29 each had a mammography followed by ultrasound on 11/27/12. Review of each Patient's questionnaire for both tests with Radiology Staff on 11/27/12 at approximately 10:40 AM noted that the questions of "last menstrual period" and "are you pregnant" were left blank and identified that the | The Hospital responds as follows:<br><br>The Administrative Chief of Ambulatory Imaging and The Women's Breast Center reviewed the mammography screening policy and the screening requirements and process of asking all women of child-bearing age the date of their last menstrual period (LMP) and age of menopause for non-child bearing age women and recording this information on the mammography reporting form at the staff meeting on | Administrative Chief of Ambulatory Imaging and the Women's Breast Center | January 31, 2013 | The Administrative Chief of Ambulatory Imaging and The Women's Breast Center will conduct 10 medical record audits a month for three (3) consecutive months and then 10 medical record audits quarterly for one (1) year to ensure all mammography |

49

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| patients did not have a hysterectomy or ovaries removed. Interview with Radiology Staff on 11/27/12 indicated that the entire questionnaire should be completed by radiology staff for all females of childbearing age. The hospital policy for radiation safety directed to screen all females, regardless of age who are menstruating and in general are between the ages of 11 and 55 to ascertain pregnancy prior to procedures using ionizing radiation. | December 5, 2012. | | | reporting forms are complete |
| The following are violations of the Regulations of Connecticut State Agencies Section 19-13-D3 (a) Physical plant (1)(2)(4) and/or (b) Administration (2) and/or (i) General (6).<br><br>18.      The facility did not ensure that soiled linen or trash collection receptacles do not exceed 32 gal (121 L) in capacity and Mobile soiled linen or trash collection receptacles with capacities greater than 32 gal (121 L) are located in a room protected as a hazardous area when not attended as required by the referenced LSC.<br>a.      On 11/26/12 at various times throughout the survey the surveyor, accompanied by the Director of Engineering, | The Hospital responds as follows:<br><br>a. All employees of Environmental Services were notified by the Director of Environmental Service on the day of the survey not to use containers larger than 32 gallons in non-protected areas. The employees of Environmental Services were also reminded during their daily huddle the day following the survey and following days throughout December of this policy. | a. The Director of Environmental Services is responsible for implementation | a. December 31, 2012 | a. The Director of Environmental Services will conduct random observation once a week for three (3) consecutive months of units/department within the Hospital to ensure those containers of 32 gallons or less are used in areas that are not protected as hazardous areas. |

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implemen | Measurement Strategy |
|---|---|---|---|---|
| observed that mobile soiled linen or trash collection receptacles with capacities greater than 32 gal (121 L) being utilized throughout the entire facility were not located in a room protected as a hazardous area when not attended as required by the referenced LSC standard.<br>b.      On 11/26/12 at 12:30 PM, the Director Safety and Security Department and the Executive Director of Facilities Management did not provide the surveyor with documentation to indicate that electrical equipment used by a production company for the filming of a TV show on the patient occupied third floor (seventeen patients), Whittingham/Special Care Pavilion, Maternity and Women's Health Unit were inspected as required in NFPA 99, Section 7-5.1.3., 7-5.2.2.1 and 7-6.2.1.2 and as part of the facilities preventive maintenance program; i.e., inspection and/or testing for physical integrity, resistance, leakage current tests and chassis leakage current was not conducted and recorded by the facility before the equipment was put into service by the production company. | b. An immediate corrective action plan was developed on the day of the survey, including a policy covering future occurrences of this type. The policy: *Filming of Motion Pictures, Television Shows and Other Related Projects* ensures an appropriate level of safety and security for filming projects conducted by outside entities.  All filming activities conducted by outside entities will be evaluated for risk prior to entering into any agreement. Prior to approval of any filming project, a risk assessment, including any risk mitigation activities, will be reviewed and approved  by an Administrative Sponsor from the senior leadership team, the | b. The Director of Safety and Security | b. February 28, 2013 | b. The Director of Safety and Security will ensure that all filming in the organization follows the policy: *Filming of Motion Pictures, Television Shows and Other Related Projects.*<br>The policy will be posted for Stamford Hospital leadership to review and sign-off in the education system, HealthStream. |

51

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| observed that mobile soiled linen or trash collection receptacles with capacities greater than 32 gal (121 L) being utilized throughout the entire facility were not located in a room protected as a hazardous area when not attended as required by the referenced LSC standard.<br>b.      On 11/26/12 at 12:30 PM, the Director Safety and Security Department and the Executive Director of Facilities Management did not provide the surveyor with documentation to indicate that electrical equipment used by a production company for the filming of a TV show on the patient occupied third floor (seventeen patients), Whittingham/Special Care Pavilion, Maternity and Women's Health Unit were inspected as required in NFPA 99, Section 7-5.1.3., 7-5.2.2.1 and 7-6.2.1.2 and as part of the facilities preventive maintenance program; i.e., inspection and/or testing for physical integrity, resistance, leakage current tests and chassis leakage current was not conducted and recorded by the facility before the equipment was put into service by the production company. | b. An immediate corrective action plan was developed on the day of the survey, including a policy covering future occurrences of this type. The policy: *Filming of Motion Pictures, Television Shows and Other Related Projects* ensures an appropriate level of safety and security for filming projects conducted by outside entities. All filming activities conducted by outside entities will be evaluated for risk prior to entering into any agreement. Prior to approval of any filming project, a risk assessment, including any risk mitigation activities, will be reviewed and approved  by an Administrative Sponsor from the senior leadership team, the | b. The Director of Safety and Security | b. February 28, 2013 | b. The Director of Safety and Security will ensure that all filming in the organization follows the policy: *Filming of Motion Pictures, Television Shows and Other Related Projects.* The policy will be posted for Stamford Hospital leadership to review and sign-off in the education system, HealthStream. |

51

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| observed that mobile soiled linen or trash collection receptacles with capacities greater than 32 gal (121 L) being utilized throughout the entire facility were not located in a room protected as a hazardous area when not attended as required by the referenced LSC standard. | | | | |
| b.        On 11/26/12 at 12:30 PM, the Director Safety and Security Department and the Executive Director of Facilities Management did not provide the surveyor with documentation to indicate that electrical equipment used by a production company for the filming of a TV show on the patient occupied third floor (seventeen patients), Whittingham/Special Care Pavilion, Maternity and Women's Health Unit were inspected as required in NFPA 99, Section 7-5.1.3., 7-5.2.2.1 and 7-6.2.1.2 and as part of the facilities preventive maintenance program; i.e., inspection and/or testing for physical integrity, resistance, leakage current tests and chassis leakage current was not conducted and recorded by the facility before the equipment was put into service by the production company. | b. An immediate corrective action plan was developed on the day of the survey, including a policy covering future occurrences of this type. The policy: *Filming of Motion Pictures, Television Shows and Other Related Projects* ensures an appropriate level of safety and security for filming projects conducted by outside entities.  All filming activities conducted by outside entities will be evaluated for risk prior to entering into any agreement. Prior to approval of any filming project, a risk assessment, including any risk mitigation activities, will be reviewed and approved  by an Administrative Sponsor from the senior leadership team, the | b. The Director of Safety and Security | b. February 28, 2013 | b. The Director of Safety and Security will ensure that all filming in the organization follows the policy: *Filming of Motion Pictures, Television Shows and Other Related Projects.* The policy will be posted for Stamford Hospital leadership to review and sign-off in the education system, HealthStream. |

51

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| | Hospital Safety Officer, the Administrative Director of Facilities Management, a Marketing representative, the Manager of Infection Control and Prevention and the Director of the unit or area identified for use.  The Director of Safety and Security will ensure proper adherence with all safety and security related to the policy.<br><br>The policy will ensure compliance with NFPA 101-2000 including proper access, egress, separation of occupancies and hazard location protection.  The policy will also ensure that (i) a Security Officer is posted on the affected unit to ensure security; and (ii) two engineering staff members are placed on the affected unit to maintain a fire watch. The Security and Engineering staff will ensure that means of egress are continuously | | | |

V

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| | maintained free of all obstructions or impediments to full instant use in the case of fire or other emergency; i.e., production equipment and furniture related to the filming are not in use and/or stored in exit corridors of the unit. The Security and Engineering staff will ensure that the smoke barrier doors on the unit/department are not obstructed from closing by production equipment connected with a filming project and that doors to affected units automatically close when released from the magnetic hold open devices. The Security and Engineering staff will ensure that any storage areas used by the film production company in patient care areas maintain the required smoke resistance assembly required in an opening to a hazardous area. Relevant provisions of the | | | |

53

| Violation Alleged | Risk Reduction Strategy | Person(s) Responsible for Implementation | Date of Implement | Measurement Strategy |
|---|---|---|---|---|
| | policy require that film crew members complete the contractor education packet prior to working on hospital property and that the Patient Care Director of the area involved appropriately communicate with patients in advance of the event to ensure patient rights and security are maintained.  Additionally, affected staff and the film crew will be inserviced in relation to applicable environmental safety issues, and a clinical staff member will be assigned as the liaison between the Hospital and the film crew in relations to these activities. A file for each project will be maintained by the Director of Safety & Security documenting the risk identification and mitigation steps taken. | | | |

54