UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| MARC J. GRENIER, : | |
| AS ADMINISTRATOR OF THE : | |
| ESTATE OF LAURA D. SHEEHAN, : | |
| : | |
| Plaintiff, : | |
| : | CIVIL ACTION NO. |
| v. : | 3:14-cv-0970 (VLB) |
| : | |
| : | July 20, 2016 |
| THE STAMFORD HOSPITAL : | |
| STAMFORD HEALTH SYSTEM, : | |
| INC., AND EMERGENCY MEDICINE : | |
| PHYSICIANS OF FAIRFIELD, : | |
| : | |
| Defendants. : | |

**MEMORANDUM OF DECISION DENYING PLAINTIFF'S FIRST MOTION TO COMPEL [Dkt. #41]**

Plaintiff Marc Grenier ("Grenier"), in his capacity as administrator of the estate of Laura D. Sheehan ("Sheehan"), brings a claim against Defendants Stamford Hospital and Stamford Health System, Inc. (collectively the "Stamford Defendants") under the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd., *et seq.*, and a medical malpractice claim against the Stamford Defendants and Defendant Emergency Medicine Physicians of Fairfield ("EMP") under Connecticut law, for injuries and the ultimate death of Sheehan while in the care of Defendants.

I.  **Background**

On November 27, 2015, Plaintiff filed a motion to compel the production of a host of documents and responses to interrogatories. *See* [Dkt. #41]. On January 8, 2016, the Court held a hearing regarding the parties' outstanding discovery dispute. *See* [Dkt. #53]. At the hearing, the Court took the motion

1

under advisement as the parties attempted to resolve some of the issues that were in dispute at the time.  *See* [Dkt. #55].  On January 29, 2016, the Court held a follow-up telephonic hearing.  *See* [Dkt. #53].  At the hearing, the parties represented that they had made significant progress resolving their dispute, and that the sole remaining issue was whether and to what extent the Defendants could rely upon the Connecticut peer review statute, Conn. Gen. Stat. § 19a-17b, which they invoked in support of their refusal to produce peer review materials concerning the care of Plaintiff's decedent.  The Plaintiff explained that he seeks the peer review materials to see if they contain any admission of wrongdoing on the part of hospital staff, or violations of EMTALA.  The Court now resolves this dispute.

II. Discussion

    A. Federal Privilege Law Governs the Issues in this Case

Plaintiff brings an EMTALA claim and a pendant state law medical malpractice claim.  EMTALA was enacted in 1986 in response to a growing concern of "'patient dumping,' the practice of refusing to provide emergency medical treatment to patients unable to pay, or transferring them before their emergency conditions are stabilized."  *Hardy v. New York City Health & Hosps. Corp.*, 164 F.3d 789, 792 (2d Cir. 1999).  To prohibit such discrimination, hospital emergency rooms are subject to two obligations under the EMTALA: (i) to perform an appropriate medical screening and (ii) to stabilize the patient.  The screening and stabilization requirements are two separate and distinct obligations.  *Brown v. St. Mary's Hosp.*, No. 3:14-cv-228 (DJS), 2015 WL 144673, at

*2 (D. Conn. Jan. 12, 2015). Thus, to state a claim under the EMTALA, a plaintiff must allege that he "(1) went to the Defendant's emergency room (2) suffering from an emergency medical condition, and that the Hospital either (3) failed to adequately screen him to determine whether he had such a condition or (4) discharged or transferred him before the emergency condition was stabilized." *Eads v. Milford Hosp.*, No. 3:10-cv-1153 (VLB), 2011 WL 873313, at *2 (D. Conn. Feb. 23, 2011) (citing *Hardy*, 164 F.3d at 792).

The Amended Complaint raises both failure to screen and stabilize claims. *See* [Dkt. #10, Am. Compl. at ¶ 5]. To prevail on a failure to screen claim, a plaintiff must identify a "departure from standard screening procedures" the hospital otherwise applies to patients. *Fisher v. New York Health & Hosps. Corp.*, 989 F. Supp. 444, 449 (E.D.N.Y. 1998). To succeed on a failure to stabilize claim under EMTALA, a plaintiff must show that the hospital failed to provide "medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result . . . ." 42 U.S.C. § 1395dd(e)(3)(A); *see also Brown*, 2015 WL 144673, at *2 ("[I]t has been determined by some courts that 'the stabilization requirement is not met by simply dispensing uniform stabilizing treatment, but rather, by providing the treatment necessary to 'assure within reasonable medical probability, that no material deterioration of the condition is likely to result . . . .'") (quoting *Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1259 n. 3 (9th Cir.1995)).

Under Connecticut law, malpractice is "the failure of one rendering professional services to exercise that degree of skill and learning commonly

3

applied under all the circumstances in the community by the average prudent reputable member of the profession with the result of injury, loss, or damage to the recipient of those services." *Jarmie v. Troncale*, 306 Conn. 578, 587-88 (Conn. 2012) (quotations, emphasis, and citation omitted).  Malpractice "presupposes some improper conduct in the treatment or operative skill [or] . . . the failure to exercise requisite medical skill." *Id*. at 588 (quotations and citation omitted). Accordingly, "[t]o prevail in a medical malpractice action, the plaintiff must prove (1) the requisite standard of care for treatment, (2) a deviation from that standard of care, and (3) a causal connection between the deviation and the claimed injury." *Id*. (quotations and citation omitted).

As a general rule, federal law governs the existence of a privilege in a civil action in which federal law supplies the rules of decision, and state law governs the existence of a privilege where state law supplies the rule of decision.  *See* Fed. R. Evid. 501.  However, in a civil case such as this, where there is both a federal EMTALA claim and a state medical malpractice claim and where the facts necessary to prove both claims overlap, a single rule applies, and that rule is federal privilege law.  *von Bulow v. von Bulow*, 811 F.2d 136, 141 (2d Cir. 1987) (stating that in mixed claim case where evidence sought "is relevant to both the federal and state claims . . . courts consistently have held that the asserted privileges are governed by the principles of federal law") (applying federal privilege law to both federal and pendant state law claims); *see also Brown v. St. Mary's Hosp.*, No. 3:14-cv-00228 (DJS), ECF No. 71, at 3 (D. Conn. filed Feb. 25,

2014) (applying federal privilege law to action that "raises both federal (EMTALA) and state (negligence) claims").

> **B.     The Facts of this Case Warrant Recognition of a Peer Review Privilege**
>
> > **1.     Courts have recognized a federal peer review privilege in the EMTALA context.**

As the Plaintiff correctly points out, "neither the Supreme Court nor the Second Circuit . . . has recognized [a peer review privilege] as applicable in federal EMTALA actions." [Dkt. #41, Pl.'s Mot. to Compel at 4]; *see also Francis v. United States*, No. 09 Civ. 4004 (GBD) (KNF), 2011 WL 2224509, at *4 (S.D.N.Y. May 31, 2011) ("Neither the Supreme Court nor the Second Circuit has ruled on the existence of a peer review privilege in the context of a medical . . . malpractice action."). This does not, however, resolve the issue. This is because Rule 501 of the Federal Rules of Evidence affords district courts "flexibility to develop rules of privilege on a case-by-case basis." *Francis,* 2011 WL 2224509, at *4 (quoting *Univ. of Pennsylvania v. EEOC,* 493 U.S. 182, 189 (1990)). In determining whether to adopt a new federal privilege in a given case, "a district court must consider: (1) whether the privilege serves private and public interests; (2) the evidentiary benefit that would result from denial of the privilege; and (3) recognition of the privilege among the States." *Id.* (citing *Jaffee v. Redmond*, 518 U.S. 1, 9 (1996)).

Before applying these factors, the Court first notes that, "[a]lthough there appears to be consensus among lower courts and in other circuits that no federal privilege protects medical peer review materials in civil rights or antitrust actions . . . no such consensus has developed in medical or dental malpractice actions."

5

*Id.* at *4 (citing cases).[1]  This distinction makes sense, as federal laws which touch upon medical malpractice, like EMTALA and the Federal Tort Claims Act (FTCA), incorporate state law.  Indeed, courts have noted "EMTALA's intended purpose of supplementing, rather than supplanting, state medical malpractice law . . . ."  *NRP Holdings LLC v. City of Buffalo*, No. 11-CV-472S, 2015 WL 9463199, at *4 (W.D.N.Y. Dec. 28, 2015).  Thus, it is not surprising that multiple courts have recognized state peer review privileges under federal law when presented with EMTALA or FTCA claims in addition to state law negligence claims.  *See, e.g., Brown*, No. 3:14-cv-00228 (DJS), ECF No. 71, at 3 (recognizing federal peer review privilege in connection with EMTALA claims); *Tep v. Southcoast Hosps. Grp., Inc.*, No. 13-11887-LTS, 2014 WL 6873137, at *5 (D. Mass. Dec. 4, 2014) (same); *Francis*, 2011 WL 2224509, at *5 (recognizing federal peer review privilege in FTCA context); *Sevilla v. United States*, 852 F. Supp. 2d 1057, 1068-69 (N.D. Ill. 2012) (same); *KD ex rel. Dieffenbach v. United States*, 715 F. Supp. 2d 587, 597-98 (D. Del. 2010) (same).  Several others, including the courts in both cases cited by the Plaintiff, have stopped short of recognizing a federal peer review privilege, but they nevertheless applied the state law privilege to the plaintiff's state law

---

[1] Indeed, all but two of the cases Plaintiff cites in opposition to the privilege concern federal civil rights claims.  *See* [Dkt. #41, Pl.'s Mot. to Compel at 4 (citing *Jenkins v. Dekalb Cnty., Georgia*, 242 F.R.D. 652, 655 (N.D. Ga. 2007) (declining to apply state medical peer review privilege to § 1983 claim) and *Gargiulo v. Baystate Health, Inc.*, 826 F. Supp. 2d 323, 325 (D. Mass. 2011) (declining to apply state peer review privilege to state law and federal discrimination claims under the ADA and ADEA)); Dkt. #51, Pl.'s Opp'n to Defs.' Mot. for Protective Order at 3 (citing *Johnson v. Cook Cnty.*, No. 15 C 741, 2015 WL 5144365, at *8 (N.D. Ill. Aug. 31, 2015) (holding PSQIA did not apply and refusing to apply state medical peer review privilege to prisoner's § 1983 claim)].

claims.  *See Bennett v. Kent Cnty. Mem. Hosp.*, 623 F. Supp. 2d 246, 255 (D. R.I. 2009) (applying peer review privilege to bar discovery of information "relevant only to plaintiff's state law claims"); *Sellers v. Wesley Med. Ctr., LLC*, No. 11-1340-JAR-KGG, 2012 WL 5362977, at *3 (D. Kan. Oct. 31, 2012) (holding that "evidence relating only to Plaintiff's pendant state law cause of action will be subject to the privilege to the extent it was adequately asserted by Defendant"); *Etter v. Bibby*, No. 10-cv-00557-JLK-CBS, 2011 WL 4216855, at *7 (D. Colo. Nov. 2, 2011) (same).[2]

2. <u>Recognition of a medical peer review privilege would serve public and private interests</u>.

The Connecticut peer review statute provides that:

> The proceedings of a medical review committee conducting a peer review shall not be subject to discovery or introduction into evidence in any civil action for or against a health care provider arising out of the matters which are subject to evaluation and review by such committee, and no person who was in attendance at a meeting of such committee shall be permitted or required to testify in any such civil action as to the content of such proceedings . . . .

Conn. Gen. Stat. § 19a-17b.  A peer review is "the procedure for evaluation by health care professionals of the quality and efficiency of services ordered or performed by other health care professionals . . . ." Conn. Gen. Stat. § 19a-17b(a)(2).  "[A] privilege protecting peer review records from disclosure in medical or dental practice would promote the interests of health care practitioners, health care facilities and the public, by encouraging self-evaluation and improving the quality of care." *Brown*, No. 3:14-cv-00228 (DJS), ECF No. 71, at 5 (quoting *Francis*, 2011 WL 2224509, at *16); *see also Tep,* 2014 WL 6873137,

---

[2] This approach is inapplicable here, because the peer review material Plaintiff seeks is plainly relevant to both his federal and state law claims.

7

at *4 (statutory medical peer review privileges "arise from a general understanding that 'encouraging physician candidness by eliminating the fear that peer review information will be used against them in subsequent litigation' is essential to promoting patient health and safety") (quoting *KD*, 715 F. Supp. 2d at 594).

This Court holds that there is a peer review privilege under the facts of this particular case. "To err is human," observed Alexander Pope, and "[t]he instinct of self-preservation in human society, acting almost subconsciously, as do all drives in the human mind, is rebelling against the constantly refined methods of annihilation and against the destruction of humanity."  Bertha von Suttner, Nobel Lecture, The Evolution of the Peace Movement (Apr. 18, 1906), *available at* http://www.nobelprize.org/nobel_prizes/peace/laureates/1905/suttner-lecture.html. The professional and financial ramifications of medical malpractice claims are severe and trigger the natural human instinct of self-preservation, the impulse to withhold information which could conceivably be perceived as a wrongful act or omission.  The peer review process is designed to give physicians a safe place to fully disclose their conduct and analyze it together with their peers, with the benefit of 20/20 hindsight, in a constructive setting.  Its purpose is to improve the medical standard of care, and in so doing, patient care and outcomes.  The confidentiality of the peer review process would relieve physicians from the fear of reprisals and the self-preserving instinct to withhold information necessary to achieve the goals of peer review.  It would engender candid and probing reflection and collaborative critical evaluation of not only the attending

physicians' actions, but of the hospital's policies and procedures as well. The Supreme Court recognized the critical value of trust in the medical setting in *Jaffee*, where it reasoned that the confidentiality of communications between a patient and their psychologist promotes confidence and trust necessary for effective therapy. *Jaffee*, 518 U.S. at 10-11. The peer review privilege is even more compelling than the doctor-patient privilege because the peer review privilege has a greater impact. It not only improves the treatment of individual patients, but because of its collaborative nature, it affects hundreds, if not thousands, of patients served by the institution. Without a confidential peer review process, human nature dictates that the human instinct of self-preservation will subvert the search for the truth and thwart discoveries which invariably lead to advancements in the quality of medical care and service, a vital public interest.

Having determined that the peer review privilege at issue here fosters this vital public interest, the Court turns to the facts of this case to determine whether the privilege permits the Defendants to withhold the particular peer review material Plaintiff seeks.

> 3. **Any evidentiary benefit Plaintiff would likely obtain from denial of the privilege would be minimal.**

Plaintiff has presented no evidence that the peer review materials sought contain relevant information which he has not and cannot obtain from other sources. Plaintiff postulates that these materials *may* contain affirmative admissions of wrongdoing by the Defendants, but he offers no evidence to support this assertion. Beyond this claim, Plaintiff identifies document requests

9

in response to which the Defendants have raised the Connecticut peer review privilege.  These requests seek numerous categories of documents across multi-year periods regarding relatively broad topics, including the decedent's physical and medical condition, EMTALA compliance, the diagnosis or treatment of ischemic stroke, staffing and patient levels, and subsequent corrective action plans.  See [Dkt. #41, Pl.'s Mot. to Compel at 5-20].  Plaintiff's medical records, together with non-privileged hospital and third party records, would appear to provide Plaintiff with a host of information on each of these topics, and Plaintiff does not identify any relevant information unique to the peer review materials that he would otherwise be without.

For instance, Plaintiff submitted to the Court records from the Connecticut Department of Public Health, which appear to contain much of the information Plaintiff seeks, including evidence regarding Defendant Stamford Hospital's policies and procedures and the extent to which the Defendants complied with them.  See [Dkt. #59-2 at 1 (stating that the Connecticut Department of Public Health's Facility Licensing and Investigations Section was "able to validate non-compliance with federal/state laws within the jurisdiction of the Department"); Dkt. #59-1 at 3 (stating that "documentation and interviews failed to reflect that [Plaintiff's decedent] had continued comprehensive medical oversight . . . [Emergency Department] policies that govern medical management and . . . that the case was formally reviewed in hospital Quality Assurance Performance Improvement (QAPI) process to ensure quality improvement and patient safety"), 14-26 (enclosing Defendant Stamford Hospital's Plan of Correction which

addresses current and proposed screening and Emergency Department patient management policies and procedures)]. Plaintiff has not proffered any evidence to suggest that the peer review materials he seeks contain any relevant information beyond that appearing in the documents produced by the Defendants and third parties, such as the Connecticut Department of Public Health. Accordingly, these materials sufficiently mitigate the risk that application of the peer review privilege in this EMTALA case would "exclude[] reliable and probative evidence." *Brown*, No. 3:14-cv-00228 (DJS), ECF No. 71, at 5 (quoting *Jaffee*, 518 U.S. at 18-19 (Scalia, J., dissenting)); *see also Tep*, 2014 WL 6873137, at *5 (noting that "the facts necessary to develop Tep's EMTALA claim have been disclosed in other documents contained in the relevant medical files, as the events central to Tep's EMTALA claim occurred outside the peer review process").

    4. <u>The peer review privilege is widely recognized</u>.

    First, "[a]ll 50 States and the District of Columbia recognize some form of medical peer review privilege." *Francis,* 2011 WL 2224509, at *6. In addition, in 2005, Congress passed the Patient Safety and Quality Improvement Act ("PSQIA"), which holds as privileged documents provided to a "patient safety organization," which the statute defines as "a private or public entity or component thereof that is listed by the Secretary [of Health and Human Services] pursuant to section 299b-24(d) of [Title 42]." 42 U.S.C. § 299b-21(4).

    The Plaintiff correctly contends that the PSQIA was "not intended to provide blanket protections for all quality control purposes," and its scope is

limited to "'patient safety work product' as defined by the PSQIA." [Dkt. #51, Pl.'s Opp'n to Defs.' Mot. for Protective Order at 5-6]; *see also Schlegel v. Kaiser Found. Health Plan*, No. CIV 07-0520 MCE KJM, 2008 WL 4570619, at *3 (E.D. Cal. Oct. 14, 2008) (stating that PSQIA "carves out a narrow peer review privilege for work product prepared by a patient safety organization or prepared for, and reported to, a patient safety organization"). However, the Defendants do not contend that the PSQIA privilege directly applies to the documents at issue. Instead, they urge the Court to follow those which have relied upon the existence of the PSQIA as further evidence warranting the recognition of a federal peer review privilege. *See* [Dkt. #46-1, Defs.' Mot. for Protective Order at 12-14]; *see also Brown*, No. 3:14-cv-00228 (DJS), ECF No. 71, at 8; *Francis,* 2011 WL 2224509, at *6; *Tep*, 2014 WL 6873137, at *5 (noting that "since Congress enacted the PSQIA, at least three federal courts have recognized some form of a medical peer review privilege under federal common law").

Turning to the legislative history of the PSQIA, it is noteworthy that its purpose was to promote "a 'culture of safety' that focuses on information sharing, improved patient safety and quality and the prevention of future medical errors . . . by providing for broad confidentiality and legal protections of information collected and reported voluntarily . . . ." *KD*, 715 F. Supp. 2d at 595 (quoting S. Rep. No. 108-196 at **2-3 (2003)). Moreover, the language of the Act reflects its broader scope vis-à-vis the Health Care Quality Improvement Act (HCQIA), on which previous courts have relied in declining to find a federal peer review privilege. *Id.* (noting that "[w]hile the HCQIA applies only to peer review

actions affecting individual physicians, the PSQIA protects all 'patient safety work product,' a term defined expansively"). In light of these facts, the Court agrees with those which have found that the PSQIA constitutes a "'shift in congressional policy' aimed at providing broad protection for peer review work product in an effort to improve patient safety and quality of care." *Tep*, 2014 WL 6873137, at *5 (quoting *KD*, 715 F. Supp. 2d at 596).[3]

Finally, it is notable that many of the courts which have declined to recognize a federal medical peer review privilege in the years following the passage of the PSQIA have either been subject to binding precedent declining to recognize such a privilege or constrained by authority within their respective Circuit against such a privilege. *See, e.g., Love v. Permanente Med. Grp.*, No. C-12-05679 DMR, 2013 WL 4428806, at *2 (N.D. Cal. Aug. 15, 2013) (noting that the Ninth Circuit, in *Agster v. Maricopa Cnty.*, 422 F.3d 836, 839 (9th Cir. 2005), "declin[ed] to find or create a federal peer review privilege"); *Guzman-Ibarguen v. Sunrise Hosp. & Med. Ctr.*, Nos. 2:10-cv-1228-PMP-GWF, 2:10-cv-1983-PMP-GWF, 2011 WL 2149542, at *7 (D. Nev. Jun. 1, 2011) (same); *Awwad v. Largo Med. Ctr.*, No. 8:11-cv-1638-T-24TBM, 2012 WL 1231982, at *1 (M.D. Fla. Apr. 12, 2012) (finding that it was "bound by the decision in *Adkins v. Christie*, 488 F.3d 1324

---

[3] Tellingly, in neither of the unpublished EMTALA opinions Plaintiff cites did the court consider the PSQIA when it declined to recognize a federal peer review privilege. The *Sellers* court appears not to have considered any federal legislation, and relied exclusively on the fact that "no such privilege has been recognized by the Tenth Circuit or U.S. Supreme Court." *Sellers*, 2012 WL 5362977, at *3. The court in *Etter* did consider Congress' treatment of peer review materials, but only the more limited privilege established by the HCQIA, which predated the PSQIA by nearly two decades. *See Etter*, 2011 WL 5216855, at *6.

13

(11th Cir. 2007)" which precluded consideration of a medical peer review privilege in federal discrimination cases); *Levans v. Saint Francis Hospital-Bartlett*, No. 15-cv-2142-SHL-TMP, 2015 WL 11017962, at *3 (W.D. Tenn. Sept. 8, 2015) (stating that "[t]he weight of authority in the Sixth Circuit and elsewhere is that no medical peer review privilege exists under federal common law") (citation and quotation omitted).  Neither circumstance is present here.

Given the significant public and private interests a peer review privilege supports, as evidenced by its unanimous adoption by the States and Congress' passage of the PSQIA, and the minimal, if any, impact that application of the peer review privilege would have on the Plaintiff's ability to make out his EMTALA claim, this Court joins the growing trend among courts in this Circuit and throughout the country by recognizing a federal peer review privilege in this EMTALA case.

III.     Conclusion

For the reasons set forth above, the Court recognizes a federal medical peer review privilege in this case.  Accordingly, Plaintiff's Motion to Compel documents and information subject to this privilege is DENIED.

                              IT IS SO ORDERED.

                              _____/s/_____
                              Hon. Vanessa L. Bryant
                              United States District Judge

Dated at Hartford, Connecticut: July 20, 2016